UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

UNITED STATES OF AMERICA,


   -against-

                                        21. Cr. 277 (PAE)

ARWA MUTHANA

                    Defendant.

-----------------------------------------------------X


Defendant's Sentencing Memorandum


Christine Delince, Esq.
The Law Offices of Onaodowan & Delince, PLLC.
100 Church Street
8th Floor
NY, NY 10007


Karloff C. Commissiong, Esq.
Adams &Commissiong
65 Broadway, Suite 1603
New York, NY 10006

"Is it weird that I feel happy to be here?" This was one of the first questions Arwa Muthana asked counsel in April of 2021 when she first arrived at the Metropolitan Detention Center ["MDC"]. Months later, Arwa Muthana was able to explain that what she was feeling was a sense of relief at being away from her parents and safe from abuse. It took the intervention of a mitigation specialist and psychologist for Arwa Muthana to learn that her initial reaction was a response to the trauma she had suffered for decades. It is startling to realize that being at MDC was one of the first times Arwa Muthana felt safe in in her own living space. Since that time, she has learned that discussing trauma is how one heals from it.

Arwa Muthana's desire to join ISIS was not based on the actual hatred of America or Americans and she never had a true desire to harm people. Her actions were those of an abused and traumatized young woman who was trying to get as far away from home as possible. Her trauma warped her world view, mistakenly leading her to believe that an organization like ISIS would provide her with a sense of protection and community. Arwa Muthana's awareness is the result of healing and reflection through the help of professionals.

## I.      INTRODUCTION

This memorandum is submitted as Arwa Muthana's sentencing recommendation. We request that the Court impose a below guidelines sentence of time served, 3 years of supervised release, and mental health treatment, pursuant to the Court's authority under 18 U.S.C. §3553(a) and United States v. Booker, 543 U.S. 220 (2005). Although this is an extraordinary request, Arwa Muthana's behavior and personal history in this case warrants the careful consideration of such a sentence. A below guidelines sentence would ensure that Arwa Muthana was punished for this very serious crime but would also ensure that, after putting this brief period of poor

judgement behind her, this young woman is able to have a fruitful and productive life. The instant offense is Arwa Muthana's first contact with the criminal justice system, and while very serious, did not result in any loss of life, or any actual concrete acts against the United States.

Title 18 U.S.C. §3553(a) requires this Court to impose a sentence which is sufficient but not greater than necessary to reach the sentencing goals of Congress. Those goals include providing just punishment, protecting the public from the future crimes of the offender and providing necessary vocational and rehabilitative needs of the offender. 18 U.S.C. §3553(a)(2). This submission focuses upon the background, history and circumstances of Arwa Muthana. Her actions were the misguided musings of an abused young woman who mistakenly thought that she had nowhere else to turn for security, guidance and meaning in her life.[1] Counsel strongly believes that when the Court reviews the circumstances of Arwa Muthana's upbringing and her participation in this offense, a total sentence of time served and 3 years of supervised release, and mental health treatment is warranted.

## II.  CYCLE OF ABUSE

---

[1] A letter written by Arwa Muthana is submitted as Exhibit A.
[2] A mihwash is a large wooden utensil which Yemeni women use to cook a dish called aseed. A photograph of a mishwah is included as Exhibit B.

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED][6]

---

3 Hoda Muthana, now aged 28, ran away from her family home in 2014 to join ISIS. She has since denounced ISIS and is currently in a Syrian refugee camp with her young son.

4 Arwa Muthana's personal and family histories are detailed in the P.S.R. at ¶¶ 48-54, her physical condition, and mental and emotional health, are discussed at ¶¶ 55-57; and her education and vocational skills, and employment and financial condition are discussed at ¶¶ 58-62.

5 Photographs produced by the government pursuant to Rule 16 and taken from Ahmed Muthana's phone show that he was documenting some of his wife's physical abuse against him. Those photographs are submitted as Exhibit C.

6 Yu, Meichen, et. al. "Childhood trauma history is linked to abnormal brain connectivity in major depression." https://www.pnas.org/doi/10.1073/pnas.1900801116 (April 8, 2019).



████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████

████████████████████████

████████████████████████████████████████████

▓▓▓▓▓▓▓ She reports that she was not allowed to stay in the library after school to study, either in high school or in college.[8] Her mother believed that it would lead to rumors being spread about Arwa Muthana being a "loose woman," hurting her marriage prospects. As a result of the family's strict cultural rules, each day after school, instead of studying, Arwa Muthana was required to do housework, including cleaning and cooking for her large family. She was not allowed to do her homework until all of her chores were done. By the time she was free to study and do homework, Arwa Muthana was often too tired to do anything but go to sleep.[9] On the other hand, Arwa Muthana's brothers, who all attended the University of Alabama at Birmingham, were allowed to stay after class to study in the library.

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████   ███████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

---

[8] Arwa Muthana's struggling grades is evident in her college transcript, submitted as Exhibit D.
[9] Arwa Muthana later learned after her sister left the country, that her sister had been too tired and overwhelmed to try and keep up with her college courses. She had dropped out in 2014 and was just pretending to go to class until she ran away.
[10] A report written by licensed social worker and mitigation specialist Jenny Crawford is submitted as Exhibit E.

███████████████████████████████████████

██████[11]

████████████████████████████████████

████████████████████████████████████ █ ███

███████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████

██████████████████████████████████████

████████████████████████[13]

## III. SOCIAL MEDIA AND THE "RADICALIZATION" OF ARWA MUTHANA

Online fantasy world became a way to escape abuse

Although Arwa Muthana ████████████████████████████
█████████████████████████, she had outlets to distract her and remind her that

life could be good. She had her sister Hoda, a small but close group of girl friends who were also

from Yemen, and her little brother Mohammed with whom she bonded over their love of ice

cream and soccer.

However, things began to change when the one person at home who had a shared

experience with her, ran away from home. In November of 2014, Arwa Muthana's younger sister

Hoda ran away from home to join ISIS. Arwa Muthana was incredibly hurt, scared and betrayed

---

11 Dr. Barber's report is submitted as Exhibit F.
12 A portion of her MDC records is submitted as Exhibit G
13 ████████████████

by her sister's actions. Luckily for Arwa Muthana at this time, she had her college courses to distract her. However, once she graduated, all of that changed. She realized that she was completely alone as the target of her mother's brutal anger and frustrations. In addition, her small group of friends ostracized her due to her sister's actions. One of Arwa Muthana's friends told her, "my mother told me not to speak to you anymore." Arwa Muthana reports that she was very hurt and upset that her friends decided not to support her and stick beside her, while her brothers' lives seemed to continue with no consequences.

Without college courses and friends, or even a sister to distract her from her home prison, Arwa Muthana was starting to feel the debilitating effects of loneliness and lack of meaningful connection to others. Despite her loneliness, Arwa Muthana had a cellular phone.  A cell phone was something private and not regulated by her parents. Therefore, she began spending more and more time online. The lonelier she felt, the more time Arwa Muthana began spending online.

There is a growing body of knowledge about how groups like ISIS use the internet and social media to spread their violent agenda. The internet differs from traditional media outlets because information is disseminated in larger volumes and at faster speeds and different formats, such as videos or direct messaging between individuals.[14] The internet is also open to individual control.[15] The internet also offers people the ability to target a global audience, reaching people anywhere, at any time.[16] Social media platforms that offer the same or similar characteristics have allowed extremist groups to target and reach those that may have otherwise not come across their group.[17] In this way, terrorist groups offer a sense of belonging for which many traumatized and

---

14 Alava, Seraphin; Frau-Meigs, Divina; Hassan, Ghayda. "Youth and Violent Extremism on Social Media." https://unesdoc.unesco.org/ark:/48223/pf0000260382 (2017).
15 Id.
16 Id.
17 Id.

disaffected youth seek.

Human connection is a basic human need and one of the main reasons people join social networking platforms in the first place. This desire has nothing to do with terrorism, extremism, or violence. However, knowing this basic human trait, terrorist organizations with online visibility are attractive to those who are lonely.[18] ISIS has initiated a number of systematic online efforts to target and respond effectively to young Westerners in transition at the margins of society, who can be easily tempted by the false allure of quick and easy social connections amidst an individualistic society from which they feel alienated. Rather than contemplating and deciding whether the ideas within the ideology of ISIS are rational and worthy of assent, young, disaffected and traumatized people are more likely to be drawn in by attachments to those already embedded in ISIS as a way to thwart these issues.[19] In this way exploring social media became an outlet for Arwa Muthana's dreams of leaving home. Trauma, loneliness and depression became the driving factors that led a shy and quiet young woman from Hoover, Alabama, to meet with undercover officers in New York City in order to secure passage to Yemen in an effort to join ISIS.

## IV. SEEKING SOLACE

### Prayer, Koran and Mosque

█████████████████████████ and subsequent isolation as a result of Hoda Muthana leaving, Arwa Muthana started to become a strict follower of Islam. Religion began to provide her with the comfort and connectedness she desperately needed. Arwa

---

18 Baumeister RF, Leary MR. The need to belong: desire for interpersonal attachments as a fundamental human motivation. *Psychol Bull*. 1995;117:497-529.
19 Callimachi R. "ISIS and the lonely young American." https://www.nytimes.com/2015/06/28/world/americas/isis-online-recruiting-american.html. June 27, 2015.

Muthana's brothers noticed that her strict adherence to Islam, which began in 2019, included covering her entire body, instead of just her hair. In addition, she rarely left home. According to her brothers, "all she did was pray, read the Koran and go to the Mosque." After a while, her newfound adherence became more extreme. She began to lecture her brothers and her father about how they were not being good Muslims. In addition, Arwa Muthana stopped doing things that she had previously enjoyed, such as going to the movies, and watching soccer with her youngest brother. She no longer spent time with the few remaining friends she had. Further, her brothers recalled that in the months and weeks before Arwa Muthana left, the tension between Arwa Muthana and their mother increased.

Culture became a prison and marriage the escape

The older Arwa Muthana got, the more her parents pressured her to marry someone of their choosing who was from their specific region of Yemen. Arwa Muthana reports that she slowly began to panic and, in her isolation, and fear, turned back to her new online life and began to search for a husband of her own choosing. Her desperation led her to the propaganda of ISIS. Their propaganda made her believe that she would be happy and protected with them, in their "Caliphate." As a result, she wanted to find someone with the same beliefs, because she believed that this person could make her happy and made her feel protected by taking her out of the country and far away from home.

Years of abuse, trauma and isolation, led Arwa Muthana to find James Bradley, in November of 2020. Although there was an almost ten-year age difference, the fantasy of an online world they fueled a quick attachment between the two. Arwa Muthana reports that when she started opening up to James Bradley about her home life, for the first time she felt that someone actually cared about her.

A clash of cultures

Arwa Muthana's parents Ahmed Muthana and Basma Elshaeri were born in a small village in Al Qurain, Yemen, with a population of approximately 160 people that is located in the southern province of Dhala. Ahmed Muthana and Basama Elshaeri were both raised in very traditional Yemini homes, which focused on girls being raised to become proper mother's and housewives. Basama Elshaeri grew up being told that "girls are harder to raise then boys," and therefore needed a stronger hand in discipline. While Ahmed Muthana left his village for university when he was a young man, the first time Mrs. Elshaeri left her village was when she moved to the United States with her husband in 1990.

Like many immigrants who move to America, Basama Elshaeri was afraid that her children, especially her daughters, would become too "Westernized." ████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████
███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████

## V. OBJECTIONS TO FINAL PRESENTENCE REPORT

According to the government and Probation, in June of 2020 Arwa Muthana completed an

online marriage and matchmaking form associated with ████████████.[20] Arwa Muthana

objects to this statement. ████████████ has been deceased since 2011. The online

matchmaking form Arwa Muthana was interested in was being run by a man named ████████

████ Arwa Muthana is not aware of any association between ████████████████████

██████

## VI. THE INSTANT OFFENSE

<u>Terrorism Enhancement</u>

When U.S.S.G. § 3A1.4—the so-called "terrorism enhancement"—is invoked, it has a

dramatic impact on sentences because it arbitrarily increases a defendant's offense level and

criminal history score, resulting in unthinkable sentencing ranges for first time offenders who did

not actually hurt (or come close to hurting) anyone. This guideline represents bad policy and does

not serve the purposes of 18 U.S.C. § 3553(a). In particular, the terrorism enhancement treats all

---

20 See ¶20 in PSR.

defendants convicted of a broad set of crimes the same, without accounting for their specific offense characteristics or their actual criminal history. Criminal conduct subject to the terrorism enhancement varies significantly, from attempting to provide support to a foreign terrorist organization, to actually perpetrating a violent terrorist attack resulting in death or injury. A person who attempts to board a boat from the United States to Yemen, should not be punished the same as a person who kills someone in a terrorist attack. Accordingly, the terrorism enhancement serves no legitimate purpose, and the Court should decline to apply it.

The guideline ensures that Arwa Muthana will be sentenced as if she committed one of the most serious offenses addressed by the Sentencing Guidelines, regardless of where the offense level fits on the spectrum of "material support." U.S.S.G. § 3A1.4(a). Additionally, the automatic shift to Criminal History Category Level VI, which is the highest and therefore most culpable level, ensures that Arwa Muthana will be sentenced as if she was a career criminal, even though she has no prior arrests and absolutely no criminal record.  Applying this guideline often causes a defendant to receive a greater increase in a sentence than a defendant who commits a more plainly violent offense.[21]

Evidence against Arwa Muthana

The evidence against Arwa Muthana consists of her online participation in group chats in

---

[21] Cf. U.S. Sentencing Comm'n, Analysis of the Violent Crime Control and Law Enforcement Act of 1994 (H.R. 3355, as Passed by the Senate November 19, 1993, and by the House April 26, 1994): Part II 13 (1994) (emphasizing the possibility of prison sentences for terrorism cases under-punishing defendants, but noting that the mandate to provide an enhancement for felonies promoting terrorism may present a problem "for the Commission [in] that it may be difficult to develop a single fixed guideline enhancement for terrorism that would appropriately account for the seriousness of the conduct in all cases…While the terrorist goal may be serious in all cases, the specific crimes a defendant may commit in furtherance of terrorism may not always reflect that seriousness … In addition, defendants who share a common terrorist objective may vary greatly in terms of the threat to persons and national security that they realistically pose"). U.S.S.G. section 3A1.4, however, takes a specific intent—the intent "to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct"—and elevates that factor to dwarf all other factors. 18 U.S.C. § 2332b(g)(5)(a) (2006 & Supp. 2009) (providing intent requirement for a federal crime of terrorism); see also U.S. Sentencing Guidelines Manual § 3A1.4 cmt. n.1 (referring to 18 U.S.C. § 2332b(g)(5) for the definition of federal crimes of terrorism).

which her desire to marry a "mujahideen" is discussed, as well as her desire to live in an environment controlled by extremists. She also met with a cooperating informant on two occasions and gave a videotaped statement to FBI agents upon her arrest. While her actions and words at that time are serious and concerning, what is clear from examining the evidence against her, is that Arwa Muthana's behavior and thinking were erratic, desperate and not well planned. That was because she lived in a fantasy, fueled by a desire to escape her abuse, a lack of connection and the desire to belong. Arwa Muthana was a young woman desperate to discover who she was, and a desire to openly practice her faith without the restrictions of the cultural rules imposed by her mother, was a part of that journey. Contrary to the government's assertions, Arwa Muthana's main motivations were not fueled by a desire to harm anyone.

One of the most significant pieces of evidence showing that Arwa Muthana was not actually radicalized but was in fact a traumatized and confused young woman, is the voluntary video recorded statement she gave after her arrest on March 31, 2021. In that video, whenever she was asked why she was traveling to Yemen, her response is, "we wanted to live in a place where they rule by the laws… we just wanted to live in a place where there's Islamic law." When asked what her plan was once she got to Yemen, Arwa Muthana responds, "We didn't know. We had no plans. We'd just go and— We had no contacts. No plans or anything. Just go and—and work our way through."

When Arwa Muthana was questioned further about a desire to hurt or kill, her responses make it clear that she is not a committed extremist:

**Franke:** O.K. So, what if you got over there and you realized that you guys were in ISIS-controlled territory and they tried to get you to take up arms and fight— fight for the Islamic State against—against Americans or those that don't share the same beliefs?

**Muthana:** Uh, I mean, like, there's—there's no Americans on the ground in

Yemen.

**Franke:** Saying that there don't have to be Americans on the ground in Yemen to want to fight against America and potentially hurt Americans, or foreigners, or those that don't share the same beliefs as you or the Islamic State [in] ISIS-controlled territory that you may have found yourself in—

**Muthana:** But, just because somebody goes against the Islamic law, doesn't mean that you, like, kill them off like that. It doesn't mean that.

**Franke:** So, that's what I'm tryin' to understand. So, I guess my question is, "Were you wanting to go and join ISIS and take up arms and fight?

**Muthana:** Umm. I mean, they rule by the Islamic law, so if it was necessary for me under any place where they rule by Islamic law—If I had to do that for the sake of Allah, I would do that.

**Franke:** If you had to do that for the sake of Allah, you would do it?

**Muthana:** Yeah.

**Franke:** So, you would potentially hurt Americans—or hurt whoever you had to—in order to—for the sake of Allah?

**Muthana:** Yeah, if, you know, it has to come under what is allowed in the—in Islam—and what's not. So you can't just—you can't just kill anybody that goes against it. There's more to it. And, you know, I'm still learning so—

**Franke:** So, then who are you saying that you would hurt or kill for the sake of Allah?

**Muthana:** Umm, I'm still learning about that, so I don't wanna answer because if I say anything wrong concerning the religion—It's not about any of this. It's about what Allah, like, sees in me. If I say anything wrong and spread something wrong, then that's what I care about.
So, I can't speak on that matter because I'm not very knowledgeable. So, it's like a spiritual thing. I can't—If I had knowledge, I'd speak, but I can't speak on that matter.

In addition, as early as her voluntary statement to FBI agents, Arwa Muthana notes that

she ran away from home because she felt stifled in her life. "That's one of the reasons why I left.

Because—uh—they don't let—they don't allow women to practice the way that Allah—you

know—told us to practice. Like, try to have a [unintelligible] like—they'd prevent me from doing

that, like, growth-wise, and, like, staying at home. So, I got married, and, like, that's better—because I feel like I can do a little bit more than what I—like what they prevented me I did with my husband."

## VII. CONDITIONS AT THE METROPOLITAN DETENTION CENTER

Arwa Muthana, who has never been in jail prior to her arrest on this matter, will have spent nearly two years at the MDC by the time she is sentenced.  Her time at the MDC has been especially challenging due to severe lockdowns, lack of access to counsel, and harsh living conditions. Courts in this district have routinely taken into account the harsh conditions of confinement when imposing a sentence. See, e.g., United States v. Ozols, 16 Cr. 692 (JMF) (giving defendant credit at sentencing for what he endured Case 1:19-cr-00606-SHS Document 187 Filed 02/28/22 Page 17 of 20 18 at the MDC during an eight-day blackout); United States v. Serrano, 18 Cr. 393 (LAK) (same).

When Arwa Muthana first arrived at MDC, she was placed in the "SHU" for two weeks for quarantine. Although the SHU is a disciplinary unit and Arwa Muthana had committed no infractions, she was treated the same way as inmates who were there for disciplinary issues. This means that she was only allowed to shower three times per week and allowed out of her cell for one hour per day to use the so called "rec room."[22] In addition, while in the SHU, Arwa Muthana was not allowed to have her hijab. When she explained to officers that she was required to wear a hijab for religious reasons, she was told to "use a pillow-case." While in quarantine, Arwa Muthana was not served Halal food, or even Kosher food. In addition, she was only allowed to

---

22 The rec room in the SHU is just another cell, slightly bigger than inmate cells with a window to allow air to come through. Inmates are allowed to walk in a circle in this room for exercise.

make one phone call during each two-week period.

In addition, since at least October of 2022, MDC has had staffing issues. As a result, Arwa Muthana reports that there have been two occasions when she and the other approximately forty women in her unit were locked in their dorm for twelve hours without any supervision. There have been approximately six occasions when although they were not locked in, there was no officer on guard for at least twelve hours. If an inmate had gotten ill, or attacked someone, no one would have been there to help or intervene. Arwa Muthana reports that during these times, she ███████████████████████████ wondering if something would happen, especially since two of her fellow inmates in the unit are severely mentally ill.[23] Luckily, neither Arwa Muthana nor anyone else was hurt during these long periods of no supervision. Furthermore, in October of 2022, ██████████████████████████████████████ Counsel had to contact the government in November of 2022, after which she was finally given her medication.[24]

Covid-19 Considerations

There have been several Covid lockdowns at MDC during Arwa Muthana's stay there. The most recent one was a lockdown that began in December 2021 and ended on February 24, 2022. Since the Covid-19 pandemic, judges within this district have considered the impact of the virus as a §3553(a) factor and granted downward variances based on the conditions endured by inmates at BOP facilities.[25]  The Bureau of Prisons and in particular MDC, have been criticized

---

23 Arwa Muthana is in a dorm like unit, not in individual cells.
24 In order to have Arwa Muthana seen by a psychologist at MDC in the first place, counsel had to request the intervention of this Court in October of 2021.
25 See, e.g., United States v. Morgan, 19 Cr. 209 (RMB) (S.D.N.Y. May 5, 2020), ECF No. 90 (cutting the sentence to less than half of the low end of the guidelines based in part on conditions at MDC during the pandemic and condemning the conditions at MCC and MDC prior to the current crisis); United States v. Casillas, 19 Cr. 863 (VSB) (S.D.N.Y. May 4, 2020), ECF No. 27 (reducing the length of the sentence in part based on conditions at MCC during the COVID-19 crisis); United States v. Pierson, 14 Cr. 855 (LTS) (S.D.N.Y. May 4, 2020), ECF No. 73 (same for defendant detained at MDC). In the sentencing of Tiffany Days, 19 Cr. 619 (CM), held on April 29, 2021, former Chief Judge McMahon made the following comments about the MCC: "It is the finding of this Court that the

for their many failures during the Covid-19 crisis.  The conditions of incarceration during the

pandemic were undeniably harsher than prior to the pandemic.  As stated by Judge Rakoff in

United States v. Diego Rodriguez, 2020 WL 5810161, *3 (Sept. 30, 2020)

(emphasis in original):

> it might seem, however, that this first factor, while it might support a claim for
> immediate release, would diminish in importance once the pandemic was over.
> But this is not entirely so. For - and this is the second factor - the pandemic, aside
> from posing a threat to Rodriguez's health, has made Rodriguez's incarceration
> harsher and more punitive than would otherwise have been the case.  This is
> because the federal prisons, as "prime candidates" for the spread of the virus, see
> United States v. Al Kassar, —— F. Supp. 3d ——, ——, 2020 WL 4813199, at *1
> (S.D.N.Y. Aug. 19, 2020), have had to impose onerous lockdowns and restrictions
> that have made the incarceration of prisoners far harsher than normal.

Moreover, On April 2, 2021, in United States v. Gonzalez, 18 CR 669 (S.D.N.Y),

Judge Oetken found:

> Now, the defendant has already served 24 months of detention and that really has
> been under conditions that have been extraordinarily harsh.  Most of the time has
> been in lockdown conditions 23 hours a day, basically like solitary confinement
> with no access to visitors for most of that time, virtually limited programming.
> And I do believe that because it's been harsher than a usual period that it's more
> punitive, that it's essentially the equivalent of either time and a half or two times
> what would ordinarily be served.  So I think having served 24 months is equivalent
> to having served three years.  That's what I believe in terms of how punitive it's
> been and how harsh it's been.

See 18 CR 669 (S.D.N.Y), D.E. 250, Sentence Transcript, April 2, 2021, 17:17 – 18:3.

Difficulty in freely practicing Islam

As required by her strict adherence to her religion, Arwa Muthana must wear skirts and

not pants. However, the commissary at MDC does not have any long skirts available for Muslim

women. If Arwa Muthana altered a shirt to make it a long skirt, it would be considered

---

conditions to which she was subjected are as disgusting, inhuman as anything I've heard about in any Colombian
prison, but more so because we are supposed to be better than that." (ECF No. 35, at p. 19.).

contraband. She was therefore advised to purchase overly large shirts to wear them as a skirt or dress. In addition, for many months there was no Halal food available, only Kosher food. Arwa Muthana and counsel requested that Halal food be provided, which was not done until approximately October of 2021. Her inability to properly practice her religion has contributed to her ongoing anxiety. In fact, at one time the psychologist responded to a request for a visit but did so during Arwa Muthana's prayers. Instead of respecting her prayer time and coming back at a later time, the psychologist requested that Arwa Muthana be returned to the waiting list.[26]

Lack of educational and rehabilitative courses at MDC

For much of her stay, no programs have been available due to constant lockdowns. However, in approximately March of 2022, courses once again were offered at MDC. Arwa Muthana has availed herself of any available program, especially those related to mental health, learning and overall wellbeing. She has also spent her time tutoring other inmates who are studying for their GED exam. Currently, she is enrolled in two college level history courses given by Columbia University. Each class is three hours per week, once per week for an entire semester. The courses are started January 18 and January 19, 2023.[27]

## VIII. CONCLUSION

Arwa Muthana has had the opportunity to do a lot of reflection while incarcerated. She realizes that ultimately, what she was seeking from ISIS was the ability to start a "new life."  In reality, a true "new life" requires intensive individual therapy and a stable place to live. The defense team has been assisting Arwa Muthana with the process of finding stable living once

---

26 See Exhibit G at pg.8
27 Arwa Muthana's course certificates are submitted as Exhibit H.

released and has succeeded in finding her housing.[28]

While incarcerated, for the first time in her life, Arwa Muthana has also been able to make friends with women who are not from the same religious and cultural background as her. Her ability to respect these women and their opinions and differences shows that she is not someone who carries hate in her heart and who will turn to terrorism.[29] What holds true is Arwa Muthana's deep love and commitment to her faith and religion. Islam and being a good Muslim woman are very important to her. After long introspective contemplation, Arwa Muthana has realized that her actions have brought shame to herself, her family, and Muslims everywhere. However, her family remains supportive.[30] Arwa Muthana is very remorseful about her behavior, her words, and her actions. However, this is not a young woman dedicated to the continued to support of ISIS. This is a young woman who is merely seeking a simple life. One where she is free to love who she wants, practice her religion and most importantly, be free from constant and persistent physical and emotional abuse.

Arwa Muthana is unlikely to receive the kind of focused, compassionate, and consistent mental health treatment while in BOP custody. 18 U.S.C. § 3553(a)(2)(D). As set forth in Dr. Barber's report, ███████████████████████████████ which are plainly relevant to the circumstances of her conviction, require immediate and intensive intervention and consistent medication. Unfortunately, the BOP's health service units are grossly understaffed and are not well-positioned to help Arwa Muthana.[31] The Court cannot be assured

---

28 A letter of acceptance is submitted as Exhibit I.
29 Letters from fellow inmates and a corrections officer are submitted as Exhibit J.
30 Letters of support from Arwa Muthana's family are submitted as Exhibit K.
31 See, e.g., Dep't of Justice Federal Prison System Fiscal Year 2019 Performance Budget, at p. 7 (projecting BOP to operate at 16% over its rated capacity). For example, in March 2016, the Department of Justice's Office of the Inspector General released a comprehensive review of BOP's "medical staffing challenges," describing the situation in at least some facilities as a "crisis." See Review of the Federal Bureau of Prisons' Medical Staffing Challenges, (Mar. 2016).6 See also, e.g., Christie Thompson and Taylor Elizabeth Eldridge, Treatment Denied: The Mental

that Arwa Muthana will have access to the medication and individual counseling she needs while in BOP custody. However, under the Court's supervision, Arwa Muthana can receive the appropriate treatment while on supervised release.[32]

A lifetime of abuse, isolation, and trauma resulted in a bright young woman making terrible and life altering decisions. However, in a case like this, with a person like Arwa Muthana, leaning towards compassion will go further than an extended punishment. Arwa Muthana is not a radicalized ISIS fighter. She is a person who lost her way. A sentence of time served would help Arwa Muthana find her way to being a complete and productive member of society, and the Court should give such a sentence meaningful consideration.

Respectfully Submitted,

/s/Christine Delince, Esq.

/s/Karloff Commissiong, Esq.

cc:  AUSA Kaylan Lasky
     AUSA Jason Richman

---

Health Crisis in Federal Prisons, The Marshall Project (Nov. 21, 2018).
32 Arwa Muthana requests that her sentence conditions specifically allow her to communicate with James Bradley. She also requests a female officer for supervised release.