UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

JAMES BRADLEY,
   a/k/a "Abdullah," and
ARWA MUTHANA,

                         Defendants.

21 Cr. 277 (PAE)

**THE GOVERNMENT'S SENTENCING MEMORANDUM
AS TO DEFENDANTS JAMES BRADLEY AND ARWA MUTHANA**

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
for the United States of America

Kaylan E. Lasky
Jason A. Richman
Assistant United States Attorneys
   *Of Counsel*

**Table of Contents**

PRELIMINARY STATEMENT ................................................................................................... 1

BACKGROUND ...................................................................................................................... 4

   I.   The Offense Conduct ................................................................................................. 4

      A.   Bradley Plans to Travel to Afghanistan with Hossain to Join the Taliban .................... 4

      B.   ISIS ........................................................................................................................ 6

      C.   Bradley's Allegiance to ISIS After Hossain's Arrest ...................................... 8

      D.   Muthana's Support for ISIS Prior to Marrying Bradley ................................ 12

      E.   Bradley and Muthana Marry, Attempt to Travel to Join ISIS in the Middle East, and Are Arrested ............................................................................................................ 13

      F.   Execution of Search Warrants on Bradley's Residence and Truck, and on Muthana's Devices ........................................................................................................................ 22

      G.   Bradley's Dissemination of ISIS Propaganda and Violent Imagery on Social Media . 25

   II.   Procedural History ................................................................................................. 27

DISCUSSION ........................................................................................................................ 28

   I.   Applicable Law ...................................................................................................... 28

   II.   The Undisputed Guidelines Sentence Is 240 Months' Imprisonment for Bradley and Muthana ................................................................................................................................ 29

      A.   Application of the Terrorism Enhancement Is Appropriate ......................... 30

   III.   The Defendants' Relative Culpability .................................................................. 37

   IV.   A Sentence of at Least 180 Months' Imprisonment and the Imposition of Lifetime Supervised Release Would Be Appropriate for Both Bradley and Muthana ......................... 39

      A.   The Nature and Seriousness of the Defendants' Conduct and the Need for Just Punishment Warrant a Sentence of at Least 180 Months' Imprisonment........................... 39

      B.   A Sentence of at Least 180 Months' Imprisonment Is Necessary to Protect the Public from Further Terrorism Crimes Committed by the Defendants .......................................... 43

      C.   Bradley's Personal Circumstances Do Not Support a Sentence of Less Than 180 Months 43

      D.   Muthana's Personal Circumstances Do Not Support a Sentence of Less Than 180 Months ................................................................................................................................ 46

      E.   A Sentence of at Least 180 Months' Imprisonment Will Avoid Creating Unwarranted Sentence Disparities................................................................................................................ 48

      F.   A Sentence of at Least 180 Months' Imprisonment is Necessary to Afford Adequate Deterrence and to Promote Respect for the Law ................................................................... 53

CONCLUSION ...................................................................................................................... 56

## Table of Authorities

**Cases**

*Gall v. United States*, 552 U.S. 38 (2007) ............................................................... 30
*United States v. Alaa Sadeh*, No. 15 Cr. 558 (D.N.J.) ........................................... 53
*United States v. Alhaggagi*, 978 F.3d 693 (9th Cir. 2020) ............................... 35, 36
*United States v. Alimehmeti*, No. 16 Cr. 398 (S.D.N.Y. 2017) ......................... 37, 52
*United States v. Babafemi*, No. 13 Cr. 109, 2021 WL 1210313 (E.D.N.Y. 2021) ...... 58
*United States v. Badawi, et. al*, No. 15 Cr. 60 (C.D. Cal.) ..................................... 53
*United States v. Ceasar*, 10 F.4th 66 (2d Cir. 2021) .............................. 33, 55, 56, 57
*United States v. Clark*, No. 20 Cr. 76 (NRB) (S.D.N.Y.) ............................... 37, 53, 58
*United States v. El Bahnasawy*, No. 16 Cr. 376 (RMB) (S.D.N.Y.) ......................... 38
*United States v. Farhane, et al.*, No. 05 Cr. 673 (LAP) (S.D.N.Y.) ..................... 52, 53
*United States v. Hossain*, No. 19 Cr. 606 (SHS) (S.D.N.Y.) ................................. 3, 54
*United States v. Kimbrough*, No. 552 U.S. 85 (2007) ............................................. 38
*United States v. Kourani*, 6 F. 4th 345 (2d Cir. 2021) ........................................... 53
*United States v. Meskini*, 319 F.3d 88 (2d Cir. 2003) ............................. 33, 36, 39, 46
*United States v. Mumuni Saleh*, 946 F.3d 97 (2d Cir. 2019) ............................... 37, 56
*United States v. Naji*, No. 16 Cr. 653 (FB) (E.D.N.Y.) ........................................... 56
*United States v. Pugh*, No. 15 Cr. 116 (NGG) (E.D.N.Y.) ....................................... 53
*United States v. Rahimi*, No. 16 Cr. 760 (RMB) (S.D.N.Y.) ................................... 38
*United States v. Raishani*, No. 17 Cr. 421 (RA) (S.D.N.Y.) ............................... 51, 53
*United States v. Saidakhmetov*, No. 15 Cr. 95, 2018 WL 461516 (E.D.N.Y. 2018) ...... 57
*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) ..................................... *passim*
*United States v. Ullah*, No. 18 Cr. 16 (RJS) (S.D.N.Y.) ......................................... 38
*United States v. Zea*, No. 13 Cr. 72 (SJF) (E.D.N.Y.) ............................................. 53

**Statutes**

18 U.S.C. § 1512 ....................................................................................................... 54
18 U.S.C. § 1542 ....................................................................................................... 51
18 U.S.C. § 2339 ................................................................................................ *passim*
18 U.S.C. § 3553 ................................................................................................ *passim*
18 U.S.C. § 371 ......................................................................................................... 51

**Other Authorities**

Classified Information Procedures Act ...................................................................... 28
U.S.S.G. § 2M5.3 ....................................................................................................... 31
U.S.S.G. § 3A1.4 ...................................................................................... 31, 32, 33, 39
U.S.S.G. § 3E1.1 ....................................................................................................... 31
U.S.S.G. § 4A1.3 ....................................................................................................... 38
Violent Crime Control and Law Enforcement Act of 1994 ...................................... 33

**Rules**

Federal Rule of Criminal Procedure 12 .................................................................... 28

## PRELIMINARY STATEMENT

The Government submits this memorandum in connection with the sentencings of co-defendants James Bradley, a/k/a "Abdullah" ("Bradley") and Arwa Muthana ("Muthana," or with Bradley, the "defendants"), which are scheduled for February 2, 2023 and February 3, 2023, respectively. For the reasons set forth below, the Government respectfully submits that for both Bradley and Muthana, a sentence of at least 180 months would be sufficient, but not greater than necessary, to comply with the purposes of sentencing.

Bradley, a 21-year-old resident of the Bronx, New York, and Muthana, a 30-year-old resident of Hoover, Alabama, both U.S. citizens, bonded through their deep allegiance to the Islamic State of Iraq and al-Sham ("ISIS"), and on March 31, 2021, they attempted to board a cargo ship bound for Yemen, where they intended to fight for, and die for, ISIS and its cause. Instead, law enforcement thwarted their plot to join and provide support to ISIS, and Bradley and Muthana were arrested as they attempted to board the ship.

Bradley and Muthana both, individually, radicalized and supported ISIS – a brutal terrorist group with a goal of establishing a world-wide caliphate that is known for its violence and murdering Americans around the world – before they were married in late January 2021. Prior to Bradley's arrest in the instant case, Bradley planned to travel to Afghanistan with Delowar Mohammed Hossain ("Hossain"), another New York City-based individual, in order to join the Taliban and attack American soldiers fighting in Afghanistan. On July 26, 2019, Hossain was arrested while attempting to board a plane bound for Thailand and travel thereafter to Afghanistan to join and fight for the Taliban. Bradley was not with Hossain that day, due at least in part to Bradley's concerns that Hossain's conduct and plan were not in keeping with Bradley's adherence to an even stricter version of radical Islamic ideology. Rather than being deterred by Hossain's

arrest, or by the fact that the Federal Bureau of Investigation ("FBI") interviewed Bradley after Hossain's arrest, however, Bradley doubled down on his extremist views and sought to wage jihad (*i.e.*, holy war) for ISIS. In scores of recorded conversations and chats with undercover officers ("UC-1" and "UC-2," respectively, or together, the "UCs") with the New York City Police Department ("NYPD"), Bradley discussed his plans to attack soldiers at the United States Military Academy in West Point, New York ("West Point") or to attack Reserve Officer Training Corps ("ROTC") cadets on behalf of ISIS, or to travel to the Middle East or Africa to join ISIS. In addition, Bradley used his social media and other electronic accounts to post and distribute ISIS's depraved propaganda materials and videos and photographs depicting brutal violence, such as a prisoner digging his own grave before being shot and other atrocities.

For her part, since at least June 2020 and up to the time of her arrest – in other words, at least a half-year prior to marrying Bradley – Muthana was a staunch supporter of ISIS. In numerous conversations, in-person and electronic, with a confidential source ("CS-1") who, unbeknownst to Muthana, was working with the FBI, Muthana described in detail her support for ISIS, her intention to travel overseas to support ISIS, and her desire to marry an ISIS fighter and die together.

After having met online, on January 2021, Bradley and Muthana married in an Islamic marriage ceremony. Both before and after their marriage, Bradley and Muthana discussed, and then planned and attempted to travel to the Middle East together for the purpose of joining and fighting for ISIS. In early March 2021, Bradley traveled from New York to Alabama to visit Muthana, and they subsequently traveled to New York in order to begin their journey to join ISIS, paying UC-2 $1,000 for entry on a cargo ship bound for the Middle East. On March 31, 2021, FBI agents arrested Bradley and Muthana, after they attempted to board a cargo ship in Newark, New Jersey, in order to join ISIS overseas. Following her arrest, Muthana waived her *Miranda* rights

and stated that she was willing to fight and kill Americans. In executing a search warrant for Muthana's cellphone, the FBI identified a trove of ISIS and other jihadist propaganda and training materials, including a video showing an individual in prisoner garb being chained and then burned alive.

In light of the defendants' conduct, while also taking into account certain mitigating factors raised by the defense, the Government respectfully submits that the Court should sentence both Bradley and Muthana to at least 180 months' incarceration, which is below the 240-month sentence called for by the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G"). The Government also submits that the Court should sentence Bradley and Muthana to lifetime periods of supervised release. For each of the defendants, such a sentence is necessary and appropriate to reflect the extraordinarily serious nature of their terrorism offense, to provide just punishment for their conduct, to deter and prevent the defendants from resuming their activities in support of radical Islamic terrorist ideology, and to deter others who, like the defendants, seek to join and serve brutal terrorist organizations like ISIS.

The United States Probation Office (the "Probation Office") recommends that the Court impose a sentence of 72 months for both Defendants, after considering, with respect to Bradley, his age, his continued familial support, his engagement in deradicalization counseling, his acceptance of responsibility, and the 96-month sentence imposed on Hossain in *United States v. Hossain*, No. 19 Cr. 606 (SHS). Presentence Investigation Report ("Bradley PSR"), dated Dec. 2, 2022, Dkt. 93, at p. 23; and with respect to Muthana, ████████████████████████ ████████████████████, Presentence Investigation Report ("Muthana PSR"), dated Dec. 21, 2022, Dkt. 94, at p. 20.

3

Defense counsel, in seeking a sentence of time-served for both Defendants, points to these and other assertedly mitigating circumstances, arguments concerning the so-called "terrorism enhancement" pursuant to the Guidelines, the conditions of detention, and comparison to other defendants sentenced for terrorism offenses. Bradley Sentencing Memorandum ("Bradley Mem."), Dkt. 95; Muthana Sentencing Memorandum ("Muthana Mem."), Dkt. 96.

The Government respectfully submits that a sentence of less than 180 months, let alone a sentence of time-served, would be wholly inappropriate. Bradley and Muthana planned, alone and ultimately together, to join and serve ISIS, and they took concrete steps to perfect and carry out those plans. Bradley also planned to potentially murder U.S. citizens within the United States before committing himself to traveling abroad to serve ISIS. Ultimately, the defendants fail to present any compelling justification counseling against the imposition of a substantial incarceratory sentence for each defendant, and other factors in this case militate strongly in favor of a sentence of at least 180 months' incarceration.

## **BACKGROUND**

### I.    **The Offense Conduct[1]**

#### A.    **Bradley Plans to Travel to Afghanistan with Hossain to Join the Taliban**

Bradley has been an adherent of extremist ideology since at least 2018, when he planned to travel with Hossain to join the Taliban in Afghanistan in order to attack American soldiers.

---

[1] The offense conduct summarized in the PSRs and herein is culled principally from recorded meetings and communications involving the Defendants and undercover law enforcement officers and confidential sources, the content of electronic devices seized from the Defendants, searches of the Defendants' online accounts, and evidence recovered during a search of Bradley's residence and truck after his arrest.

Bradley PSR ¶ 17.[2] In October 2018, Hossain introduced Bradley, then 17 years old, to another individual ("CS-2"), who, unbeknownst to Bradley or Hossain, was a confidential source for the FBI. Hossain and Bradley, together with CS-2 and a second confidential source ("CS-3") then developed a plan to travel to Afghanistan.

For months, Bradley, Hossain, CS-2, and CS-3 met in-person and communicated through WhatsApp group message threads to discuss a plot to travel to Afghanistan, join the Taliban, and fight in their jihad, and to exchange Taliban propaganda and other materials related to the Taliban and jihad. Bradley took numerous steps to actively further the jihadist plot – during in-person meetings, Bradley shared information regarding which provinces of Afghanistan the Taliban controlled; multiple overland routes that they could potentially take into Afghanistan, including from Pakistan and Tajikistan; and another foreign terrorist organization operating in Afghanistan that Bradley believed worked with the Taliban to fight the Afghan government and the Americans. On or about January 24, 2019, Hossain, Bradley, CS-2, and CS-3 traveled to a Best Buy store in Queens, where they purchased several two-way radios that each had a range of 38 miles, and Hossain began purchasing supplies from Amazon, which Hossain, Bradley, CS-2, and CS-3 discussed via WhatsApp and planned to bring to Afghanistan.

On July 26, 2019, Hossain was arrested at John F. Kennedy International Airport as he attempted to board a plane bound for Thailand, for the purpose of thereafter traveling to Afghanistan to join the Taliban. *Id.* Bradley had decided that day not to travel to join the Taliban – due in part to his stated concerns that Hossain's plans did not adhere strictly enough to Bradley's

---

[2] In this Background section, for ease of review, where both the Bradley PSR and the Muthana PSR include the same information, only the Bradley PSR is cited herein.

rigid ideological convictions. *Id.* Specifically, Hossain explained to CS-2 that Bradley had disapproved of Hossain's instructions that the group should "get dirty" by, for example, frequenting a strip club in Queens, flirting with women, downloading pornography on their phones, and going to bars, so that they would appear less like devout Muslims who may be subject to law enforcement scrutiny.[3] Bradley confirmed the same in a text message exchange with CS-2 in which he wrote that he believed the "things [Hossain] wants you guys to do are against Quran and sunnah."

On the same date as Hossain's arrest, Bradley participated in a voluntary interview with the FBI, during which Bradley stated that (i) he had intended to travel with Hossain to join the Taliban and become a martyr, but decided not to travel; (ii) Bradley did not support ISIS because of the widespread killing of innocent Muslims, but did not consider the American military to be innocent; and (iii) if a legitimate Islamic State in Afghanistan was established, he would travel there and pledge his allegiance to the Islamic State. *Id.*

**B.  ISIS**

As set forth in additional detail below, Bradley was undaunted by law enforcement's intervention or by Hossain's arrest. Instead, Bradley intensified his efforts to carry out violence in support of radical Islamic ideology and began directing his allegiance to ISIS. Muthana, who later married Bradley and planned to travel to Yemen with him, also supported, and wished to fight with, ISIS.

---

[3] All communications quoted herein are reproduced as in the original, including any typographical and grammatical errors, unless alterations are otherwise noted.

By way of background, and as the Court is well aware, ISIS – the terrorist group to which the defendants devoted themselves – is a designated Foreign Terrorist Organization ("FTO"). ISIS is notorious for promoting and carrying out brutal acts of violence, abroad and within the United States. On September 21, 2014, then-ISIS spokesperson Abu Muhammad al-Adnani ("Adnani") issued a recorded statement calling for attacks against citizens – civilian or military – of the countries participating in the then-United States-led coalition against ISIS. Bradley *Id.* ¶ 12. Specifically, Adnani called for followers to commit suicide bombings, shootings, and vehicle attacks. *Id.* Other ISIS members and associates have issued public statements and declarations, which, among other things, (i) proclaimed and acknowledged that acts of violence had been committed by ISIS; (ii) threatened future acts of violence if ISIS's demands were not met; and (iii) were intended to promote and foster the prestige and standing of ISIS. *Id.* ¶ 13. ISIS has claimed responsibility for the following terrorist attacks, among many others: (i) on November 13 and 14, 2015, a group of attackers carried out attacks in Paris, France, which killed approximately 130 people, *id.* ¶ 14; (ii) on March 22, 2016, a group of attackers carried out bombings in Brussels, Belgium, which killed at least 32 people, *id.* ¶ 14; (iii) on July 14, 2016, an attacker used a truck to run over civilians in Nice, France, killing more than 80 people and injuring more than 300, *id.* ¶ 14; and (iv) on October 31, 2017, an attacker drove a truck down a bike path in Manhattan, New York, killing eight people and injuring many others.

ISIS, like many other terrorist organizations, makes use of social media, Internet platforms, email, and end-to-end encrypted communication services and applications, such as Signal, Telegram, and WhatsApp. *Id.* ¶ 15. Through these means, ISIS has disseminated a wide variety of recruiting and training materials and propaganda, such as photographs and videos depicting ISIS activities, including beheadings and other atrocities, as well as audio and video lectures by

members of ISIS and members of other Islamic extremist organizations. *Id.* These materials serve ISIS's goals of spreading its message, recruiting supporters, enticing individuals to travel to ISIS-controlled parts of the Middle East to fight for the group, and inspiring acts of violence in the United States and elsewhere. A core component of ISIS's message is that its followers should travel to the Middle East to join ISIS, take up arms with the group, and fight against its enemies. ISIS also has encouraged followers who are unable to travel to the Middle East to instead conduct attacks in other countries. For example, on March 31, 2015, the user of Twitter account @AbuHu55ain, believed to have been used at the time by an ISIS member located in Syria, tweeted: "Lone Wolfs Rise Up"; "If you can't make the hijrah [*i.e.*, an Arabic word for "journey" that is often used by ISIS supporters to describe their travel to ISIS-controlled territory], dont sit at home & give up ... ignite a bomb, stab a kaffir, or shoot a politican!"; "if you came here, you'd be on the frontline fighting, right? But u couldn't come here, so why not fight the kuffar [*i.e.*, a derogatory Arabic term commonly used by members and associates of ISIS, to refer to non-believers] over there?"; and "i always see in the media brothers getting caught making hijrah, brothers know that your jihad is not over just because you got stopped."

### C.  Bradley's Allegiance to ISIS After Hossain's Arrest

Prior to Hossain's arrest, Hossain had brought Bradley to a meeting of the Islamic Thinkers Society, a group based in New York City ("ITS").[4] At ITS, Bradley met UC-1, and began to communicate with UC-1 about Islam and other topics. After Hossain was arrested, Bradley left

---

[4] According to http://islamicthinkers.com/home/, the Islamic Thinkers Society, or ITS, promotes the imposition of Shariah law and, "Just as fasting in the month of Ramadhan, and praying the five daily prayers is obligatory acts of worship to the Creator, Allah (swt) has also made JIHAD an obligation upon the Muslims." *See* http://islamicthinkers.com/home/?p=198.

New York City, for a time, to attend college at SUNY Albany, but stayed in contact with UC-1.

Nearly a year after Hossain's arrest, in approximately May 2020, UC-1 and Bradley began to communicate about Bradley's desire to travel or to fight for ISIS. *Id.* ¶ 18. For example, on May 27, 2020, UC-1 met with Bradley, and Bradley told UC-1 that he believed that ISIS may be good for Muslims because ISIS was establishing a caliphate, and that one of ISIS's expressed goals is to create a global caliphate. Bradley told UC-1 that if he could do "something" (*i.e.*, carry out an attack), then he would. Bradley explained that he did not mean killing innocent people, but instead that he would attack soldiers in places like West Point. *Id.* Bradley further explained that if he could not leave the United States because he might be on a terrorism watch list, he would do "something" in the United States instead. *Id.*

Bradley soon began to flesh out what that "something" might be. In a meeting on June 6, 2020, Bradley told UC-1 that he wanted to obtain a truck in order to start a construction business and for "something else." Bradley told UC-1 that he did not want to hurt civilians, but stated that he aspired to carry out an attack at West Point and discussed potentially seeking to obtain a bomb or ammunition to carry out such an attack. *Id.* On June 18, 2020, Bradley further explained to UC-1 that his plan to attack a military base was something he really wanted to do and that it would be his contribution to the cause of "jihad." *Id.*

In the course of their discussions, Bradley sent UC-1 videos that glorified violent terrorist acts, leaving no doubt as to Bradley's ultimate goal. For example, on July 26, 2020, Bradley sent UC-1 three videos on an encrypted messaging application: (i) a video containing footage of Abu Bakr al-Baghdadi ("Baghdadi"), the now-deceased former leader of ISIS, speaking in English and promoting ISIS and its cause, which describes "the camp of the jews, the crusaders, their allies, and with them the rest of the nations and the religions of kufr, all being led by America and Russia"

and shows a building being blown up and individuals in military gear fighting; (ii) a video showing individuals who claim to be from ISIS forcing a prisoner dressed in an orange jumpsuit to dig his own grave before shooting him in the head; and (iii) a video depicting an unknown male shooting a uniformed military soldier in the head, which states that their enemies "are helped and supported by America and Iran." *Id.* ¶ 19. Still images of these videos appear below:

 



And, on October 8, 2020, Bradley texted UC-1 a photograph of Baghdadi, stating that he "wish[ed] he could have met him and shook his hand and hugged him," as well as a photograph of Adnani, who has, as noted above, made public calls for suicide bombings, shootings, and vehicle attacks on behalf of ISIS.

Throughout fall 2020, Bradley continued to consider ways to support ISIS, including traveling abroad to fight with the group. During a meeting on September 17, 2020, for example, Bradley told UC-1 that Bradley planned to travel to Saudi Arabia, where his fiancée in Canada and his wife in Chile would meet him (both of whom he met prior to Muthana), before traveling together to Yemen; Bradley said he wished to travel to Yemen because "we have a chapter there" (*i.e.*, an ISIS chapter).

On October 22, 2020, Bradley sent UC-1 a video clip that showed, in part, the June 3, 2020 stabbing of an NYPD officer by an attacker ("Attacker-1"), whom Bradley stated that he knew from a mosque. *Id.* ¶ 19. Along with the video, Bradley wrote to UC-1, celebrating Attacker-1: "Allahu Akbar Check this out!! Our brother!!!!!!" *Id.* "Allahu Akbar" is an Arabic phrase meaning "God is great," which other radical Islamic extremists have proclaimed while carrying out terrorist attacks. In a meeting the next day, Bradley told UC-1 that Attacker-1 likely committed the stabbing attack because Attacker-1 was unable to leave the United States "and that's what the State (*i.e.*, ISIS) told us to do . . . if you can't leave" *Id.* Bradley declared that if Bradley found out he "couldn't leave," "it's back to the drawing board" "and then it becomes I have to do that" (*i.e.*, commit an attack domestically).

At one point, Bradley also considered fighting for ISIS in Afghanistan. In a meeting on November 6, 2020, Bradley told UC-1 that he planned to drive to Canada and fly to Pakistan with one of his wives (not Muthana), his brother-in-law, and his cousin. Bradley stated that he planned to then travel from Pakistan to Afghanistan, where he would join ISIS near Kabul. Bradley further stated that, with ISIS, he intended to fight against the "Taliban," "America" such as the "puppet government" there, and "whatever foreign people are there."

11

On December 15, 2020, UC-1 met with Bradley, and Bradley told UC-1 that an associate had told Bradley that Bradley would not be allowed to fly on an airplane because of the then-open criminal case involving Hossain. Bradley further told UC-1 that the associate had said that, in that case, Bradley could "do what you wanted to do, (*i.e.*, carry out a domestic attack)." In describing this conversation to UC-1, Bradley said, "Alright, well that sucks for *them* [laughing], that's a pretty bad mistake they made, bro, they took that freedom away from me, I'm gonna . . . ."

### D.  Muthana's Support for ISIS Prior to Marrying Bradley

Like Bradley, Muthana's communications (including social media messages and recorded CS conversations) prior to her arrest demonstrate her support of ISIS. Starting in at least summer 2021, Muthana exchanged communications with CS-1 and others reflecting her extremist views, her desire to marry an ISIS member, and plans to travel overseas to support ISIS. For example, on June 13, 2020, Muthana told CS-1 – who was also purporting to seek a husband – via electronic chat that Muthana wanted to complete an online form for the purposes of match-making for marriage.[5] When CS-1 wrote that CS-1's deceased husband had been a "mu…" (*i.e.*, a mujahideen, meaning a person who would engage in jihad), such that CS-1 "cant just marry someone normal"

---

[5] As noted by Muthana's counsel, due to the Government's inadvertent error, the PSR incorrectly states that the online form was associated with Anwar al-Awlaki ("al-Awlaki"), the deceased extremist preacher and former al Qaeda in the Arabian Peninsula ("AQAP") member. Muthana PSR ¶ 20. Rather, Muthana stated in the chat described above that the online form was associated with "Sheikh Suleiman Anwar," believed to be Suleiman Anwar Bengharsa, who has been described by the press as a U.S.-based public supporter of ISIS. *See, e.g.*, "*Maryland Imam's Advocacy of ISIS Lands Him at Center of Terrorism Probe*," The Washington Post, Oct. 6, 2016, https://www.washingtonpost.com/local/public-safety/maryland-imams-advocacy-of-isis-lands-him-at-center-of-terrorism-probe/2016/10/06/421c6627-c715-4fe7-a246-70871169cf49_story.html (Retrieved Jan. 23, 2023). As described in this submission, however, Muthana did apparently venerate al-Awlaki; her cellphone contained certain of his videos and audio lectures, and multiple files bearing quotes by al-Awlaki overlaid on his photo.

and "[h]e has to be the same," Muthana responded, "I want someone like that too." Muthana told CS-1 that one could seek out such individuals covertly, explaining "there r ways to say it I guess…if u know what I mean ex. someone who wants to do hijra and loan Allah a goodly loan," after which Muthana sent the above-referenced marriage form to CS-1.

On September 23, 2020, Muthana met CS-1 in person, and Muthana informed CS-1 that Muthana's sister had "made hijra" and praised her sister as having initially been "firm in faith," "sincere," and "ready to die right now" when her sister had first traveled to Syria.[6] Muthana lamented that her sister now just wanted to come home.

In addition to seeking out a husband who would fight for ISIS, Muthana, like Bradley, glorified acts of violence. For example, on October 18, 2020, Muthana celebrated a recent terrorist attack in France in which a man's throat was slit with a knife, writing to CS-1 in a chat, "Allahu Akbar! . . . Subhana Wa Taala [may he be praised and exalted]. . . Accept him as a shaheed [*i.e.*, martyr] . . . a lion in France! . . . . [T]he courage from this brother will reignite the courage in the other brothers!"

### E. Bradley and Muthana Marry, Attempt to Travel to Join ISIS in the Middle East, and Are Arrested

In late fall 2020, Bradley met Muthana in an online chatroom. It is clear that the defendants' allegiance to ISIS quickly drew them together. In a December 16, 2020 meeting in Alabama, Muthana told CS-1 that Bradley – whom she described as Panamanian-Irish, from New York, and as having converted three years earlier – wanted to conduct "hijra" and to marry someone who

---

[6] Muthana's sister, Hoda Muthana, traveled to Syria in November 2014 to join ISIS and married an ISIS fighter. She surrendered to U.S. and coalition forces in 2019. Bradley PSR ¶ 21.

was "on haqq" (*i.e.*, an Arabic word for "truth" that is often used by ISIS supporters to describe adherence to ISIS's ideology). Muthana further stated that Bradley wanted to travel abroad, perhaps ultimately to Syria.

Muthana was even more explicit on January 1, 2021, when Muthana and CS-1 exchanged messages via online chat: Muthana asked, "[W]hat if someone asked your hand in marriage very serious man regarding marriage…and also serious about the matter of 'dying together'…if you know what I mean[?]" Later in the same conversation, Muthana explained that she had met someone who wanted to "die together" – that is, martyr themselves for ISIS – with her and was a "blessing from [Allah]." When CS-1 asked Muthana whether Bradley had asked Muthana to "do smth [*i.e.*, something] together," Muthana responded that Bradley had said "no house no kids no etc. just 👊," rejecting the "glitter of this worldly life" (*i.e.*, an apparent reference to fighting and dying on behalf of ISIS to become a martyr). Muthana answered affirmatively when asked whether "he [*i.e.*, Bradley] ha[s] ways to do that." An excerpt of this conversation appears below:

14





Later in the same chat, Muthana conveyed that Bradley, at that point, intended to commit an attack rather than travel abroad, stating Bradley did "not mean[] making h [*i.e.*, hijrah] but…yeah," because he was "being watched…cant travel." An excerpt of this conversation appears below:



That same day, on January 1, 2021, Bradley told UC-1 that he was "torn between Plan A or Plan B," *i.e.*, the plan to attempt to travel overseas to join ISIS ("Plan A") or remain in the United States to conduct an attack for ISIS ("Plan B"). Bradley mentioned to UC-1 that he had frequently seen ROTC cadets training at SUNY Albany. Bradley stated that he could use his truck and that he along with his "wife" (*i.e.*, Muthana) could take all of the ROTC Officers "out." Additionally, Bradley told UC-1 that a former relative from Canada was trying to come to the United States, and that when he arrived, he would "join me and take these guys out," *i.e.*, attack the ROTC cadets at SUNY Albany.

Bradley and Muthana were married in late January 2021 in a small online Islamic ceremony. *Id.* ¶¶ 23, 55.

Over the ensuing months, the defendants' plans grew more and more focused on traveling to fight for ISIS. On January 29, 2021, UC-1 met with Bradley again. Bradley informed UC-1 that "the sister" (*i.e.*, Muthana) intended to travel to the United Kingdom later that year. Bradley said he would travel there with Muthana, and then travel to Gambia with Muthana so that he could teach. When UC-1 asked Bradley if he would join al Qaeda, Bradley responded, "[n]ot AQ. AQ is over with, man. These people ally with the governments." That is, Bradley was conveying that al Qaeda's methods were too conventional, not sufficiently radical, for him. Bradley explained that in Somalia and other places there are "brothers," *i.e.*, ISIS members.

On February 12, 2021, during a meeting with UC-1, Bradley explained that once overseas, ISIS members can use the "spoils of war," describing taking an M-16 from "the person you kill," and dividing the money that would go to "the State" (*i.e.*, ISIS).

On February 26, 2021, UC-1 met with Bradley, and they discussed the possibility that Bradley and Muthana would travel to Yemen. Bradley told UC-1 that he intended to travel to Aden, Yemen, for the purpose of joining the "Islamic [S]tate" and "the brothers," *i.e.*, ISIS. In particular, the following exchange occurred:

> Bradley:     Aden, that's the name of the place.
> UC-1:        That's a town?
> Bradley:     Yeah, yeah Aden, Abyan . . . Aden, they are going to give victory to Islam, and
>              look who is in Aden today[.]
> UC-1:        Who?
> Bradley:     The Islamic state
> UC-1:        They are there?
> Bradley:     Yeah Inshallah.
> UC-1:        That's what I am asking you.
> Bradley:     That's the only place that they are.
> UC-1:        Right now today?
> Bradley:     Right now today, it's the last territory they have.
>
> [. . .]

> UC-1:     So what I'm saying, are you going to join the brothers in Aden?
> Bradley:  Yeah well if I found them yeah, but if I don't find them I just keep going to Somalia.

On March 6, 2021, Bradley traveled via commercial airline from New York to Birmingham, Alabama, where he visited Muthana. *Id.* ¶ 23. The following day, Bradley and Muthana returned to New York via bus. *Id.*

Once in New York, the defendants solidified their travel plans. On March 12, 2021, Bradley raised the possibility of UC-1 helping Bradley and Muthana get on a cargo ship to travel to Asia or Africa. UC-1 stated that he could possibly help them get to Morocco on a cargo ship but was not sure and would need to speak to his friend. Bradley replied that he could make it to Libya, Egypt, or Somalia from Morocco, and each of those places was a "war zone" like Yemen. UC-1 asked Bradley whether "the brothers" (*i.e.*, ISIS) were there, and Bradley replied, "yes, they are all over."

On March 14, 2021, during a meeting, Bradley eagerly followed up with UC-1 about the possibility of traveling by cargo ship. UC-1 responded that he had not heard back from his friend. A few days later, on March 17, 2021, UC-1 met with Bradley in New Jersey. During the meeting, the following exchange occurred:

> Bradley:  You got news for me?
> UC-1:     News from which brother? Passport?
> Bradley:  Nah bro, the boat man. Allah uh Akhbar, Alhamdulillah [*i.e.*, praise be to God]. My wife was so happy bro.
> UC-1:     Maybe by tomorrow, tomorrow afternoon, I'm not sure, he's going to go give me their contact's phone number who deals with everything, who manages everything.
> Bradley:  Allah uh Akhbar.
> UC-1:     I am going to give it [*i.e.*, the phone number] to you. You are going to call him and I think you'd say something as far as like you're the traveler

Muthana kept CS-1 updated while Muthana and Bradley were planning their trip. For example, on March 17, 2021, Muthana told CS-1 that "the trip will takeover a month." Muthana also pressed CS-1 about whether CS-1 would become Bradley's wife too, stating that Bradley had claimed he could support four wives and "perhaps some slaves too."[7]

On March 18, 2021, Bradley and UC-1 exchanged a series of electronic messages in which UC-1 provided Bradley with a phone number for UC-1's "friend" who purportedly could facilitate Bradley traveling overseas on a cargo ship to join ISIS, and who was in fact UC-2. That very day, Bradley and UC-2 began exchanging messages and made plans to meet the following day.

On March 19, 2021, UC-2 met with Bradley and Muthana in New Jersey. During this meeting, Bradley told UC-2 that because Bradley could not fly, and Muthana did not have a passport, they were looking to travel by cargo ship. UC-2 asked Bradley what his plans were after his hijrah. Bradley initially responded that he wanted to "maybe like study, or just live, you know," but when UC-2 conveyed that Bradley needed to be "100% honest" about his true intentions, the following exchange occurred in Arabic, in which Bradley explained that he intended to travel to the Middle East to join and fight for ISIS:

> Bradley:   . . . after, hijrah to fight among the rank[s] of the Islamic state.
> UC-2:       With the Islamic state?
> Bradley:   God willing.

---

[7] ISIS's brutal enslavement of women has been well-documented. *See, e.g.*, "*Yazidi women raped as ISIS slaves face brutal homecoming choice: Give up their child or stay away*," The Washington Post, July 30, 2019, https://www.theguardian.com/world/2017/jul/25/slaves-of-isis-the-long-walk-of-the-yazidi-women (Retrieved Jan. 24, 2023); "*ISIS Enshrines a Theology of Rape*," The New York Times, Aug. 13, 2015, https://www.nytimes.com/2015/08/14/world/middleeast/isis-enshrines-a-theology-of-rape.html (Retrieved Jan. 24, 2023); "*ISIS Slave Markets Sell Girls For 'As Little as a Pack of Cigarettes,' UN Envoy Say*," The Guardian, June 8, 2015, https://www.theguardian.com/world/2015/jun/09/isis-slave-markets-sell-girls-for-as-little-as-a-pack-of-cigarettes-un-envoy-says (Retrieved Jan. 24, 2023).

| UC-2: | God willing, with the Islamic state? |
|---|---|
| Bradley: | The state that rules under the Sharia law and fight the enemies. |
| UC-2: | Thank God, Thank God. . . Now I feel like its worth me taking that risk. |
| Bradley: | May God bless you. |
| UC-2: | So now that I know that you are going to the right people, I'm going to do my best to get you there safely. |
| Bradley: | May Allah bless you. |

Bradley told UC-2 that, like Bradley, Muthana "wants to fight" when she arrives in Yemen. UC-2 then spoke to Muthana, in Bradley's presence. Muthana stated that she had wanted to make hijrah since her sister left, now wants to go to Yemen, and, once there, wants to help however she could, including by using her medical degree.

On March 23, 2021, UC-2 met with Bradley in New Jersey. During the meeting, Bradley paid UC-2 $1,000 in cash as travel costs for Bradley and Muthana to take the cargo ship to Yemen. Bradley told UC-2 that Bradley and Muthana planned to be "fighting" after arriving in the Middle East. With regard to Muthana, Bradley stated, "so she told me, when you asked her what you wanted to do, she was shy to tell you fighting." Bradley also explained to UC-2 that he "used to make a lot of different plans." Bradley further explained that previously he had wanted to go to Pakistan to buy a gun before traveling to Yemen, and that after getting the weapon he had planned to travel to "Khorasan State," *i.e.*, the Islamic State Khorasan, or ISIS-K, which is a branch of ISIS that was then active in Iran, Central Asia, Afghanistan, and Pakistan. Bradley told UC-2 that he had a dream that he had given "bay'ah" (*i.e.*, an Arabic term meaning the oath of allegiance) to Abu Ibrahim al-hashimi al-Qurashi, the then-leader of ISIS.

In the days that followed, Bradley and Muthana prepared for the journey to join ISIS. On March 25, 2021, UC-2 met with Bradley in New Jersey, where Bradley informed him that he had purchased waterproof clothing and boots for himself and Muthana for the trip on the cargo ship.

UC-2 told Bradley that the cargo ship would be leaving on Wednesday, March 31. Bradley praised Allah and confirmed he and Muthana planned to travel on the ship.

On March 25, 2021, Muthana updated CS-1, by chat, about her and Bradley's plans. For example, when CS-1 asked how, once Muthana and Bradley arrived in Yemen, they would find what CS-1 called the "right brothers" (*i.e.*, ISIS), Muthana responded, "if you know the general area then [God willing] you go there, yes there are a lot of groups, there's a way to go about these things [God willing] we can discuss it later but not now."

On March 31, 2021, Bradley and Muthana traveled to a location in New Jersey for the meeting with UC-2 and then entered a seaport in order to board a cargo ship that they believed was destined for Yemen. During the course of this meeting, Muthana stated to UC-2, in Arabic, regarding her intentions in traveling aboard the cargo ship: "[M]y first intention is Hijra in the sake of Allah. And you know, if Allah has willed, like I mentioned earlier, to fight in sake of Allah. . . ." The following additional exchange also occurred in Arabic, in Bradley's presence:

> UC-2:      [] Allah is the greatest. . . But do you have a vision of who you want to fight with? Because I spoke to brother Abdullah [Bradley] before . . .
> Muthana :  Yes.
> UC-2:      There's many factions in Yemen . . . []
> Muthana:   The State . . . The Islamic State.
> UC-2:      The Islamic state, Allah is great, sister. . .[]
> Bradley:   Glory be to Allah, Allah is Great.

Soon thereafter, UC-2 dropped Bradley and Muthana off at a seaport in Newark, New Jersey. Bradley and Muthana then walked up a gangplank towards the cargo ship, at which point the FBI arrested Bradley and Muthana. *Id.* ¶ 24.

Subsequent to his arrest, Bradley invoked his right to remain silent and did not give a post-arrest statement. Muthana waived her *Miranda* rights and stated during a video- and audio-recorded interview the following:

- Muthana had intended to travel with Bradley to Yemen or another land that was under Islamic law.
- Bradley, not Muthana, organized their travel to Yemen, and the plan to take a cargo ship had been conceived of only recently.
- Bradley and Muthana met in January 2021 in an online chatroom that she declined to name.
- Muthana was not planning to return to the United States after she traveled to Yemen.
- Muthana is still learning about Islam, but if there was a need for it and it were permitted, she would commit religious jihad, fight for ISIS, or kill Americans.

### F. Execution of Search Warrants on Bradley's Residence and Truck, and on Muthana's Devices

Following Bradley's arrest, the FBI executed a search warrant at a residence previously used by Bradley in the Bronx. The FBI recovered a hand-drawn image of a jihadi flag commonly used by ISIS and a hand-drawn map of the Pakistan region. *Id.* ¶ 24. Written on the map was a note that read, "sneak through." In the course of executing another search warrant, the FBI also seized a machete from Bradley's truck, a photograph of which appears below. *Id.*



The FBI executed a search warrant on several devices, including Muthana's phone, on which the FBI discovered a vast collection of ISIS propaganda, demonstrating Muthana's fervent support of ISIS. This ISIS propaganda, much of which is brutally violent, glorifies ISIS and its

leaders, terrorist agenda, anti-Western ideology, and military exploits; promotes killing non-believers; and calls for Muslims to join ISIS and serve its cause – just as Muthana attempted to do by traveling overseas to join and fight with ISIS. A small subset of the hundreds upon hundreds of such items found on Muthana's cellphone appears below:



Still of a video showing uniformed soldiers holding aloft an ISIS flag.



Still of a video showing a man wearing prison garb being chained up and then burned alive. Arabic text during the video references Quranic verses regarding the enemies of Islam being killed by fire.





Numerous photographs of individuals in military gear with ISIS flags and/or displaying the finger-pointing gesture commonly used by ISIS supporters to symbolize their allegiance to ISIS.

  

Other ISIS propaganda, including an exhortation to "build the Next Generation of defense of Islam," showing a small child wearing camouflage and a hat bearing the ISIS flag; an excerpt from "Just Terror Tactics," a portion of ISIS's *Rumiyah* magazine that provides advice to ISIS followers for carrying out knife attacks (other articles providing instructions for such attacks, *e.g.*, for committing arson attacks for ISIS, are also on Muthana's phone); and an image of a hooded individual holding a bloody knife which states that recent terror attacks in France are "only the beginning."

  

Still of a video extolling radical jihadist ideology, terrorism, and martyrdom by Anwar al-Awlaki; cover of al-Awlaki's book, "44 Ways to Support Jihad"; and an image for al-Awlaki's audio lecture series, "Lives of the Prophets." As noted above, al-Awlaki is a former leader of the terrorist group AQAP, al Qaeda's branch in Yemen. Al-Awlaki was killed in a drone strike in 2011. ISIS supporters commonly find inspiration in al-Awlaki's teachings. Dozens of al-Awlaki videos, audio lectures, quotations, and images were found on Muthana's phone.

  

**Bradley holding a knife. Various images of weapons and ammunition.**

### G. Bradley's Dissemination of ISIS Propaganda and Violent Imagery on Social Media

Bradley disseminated ISIS propaganda and glorified the acts of violence perpetrated by its members on social media, several examples of which are included below.

On November 19, 2020, Bradley posted the following photograph on one of his Instagram accounts, depicting a man walking in the desert with a backpack and a portion of the flag used by ISIS in the background:



On November 21, 2020, Bradley posted the following photograph of what appear to be jihadist soldiers carrying machineguns to the same Instagram account, along with text reading, in Arabic, "In the name of God the most merciful":



On November 26 and November 29, 2020, respectively, Bradley posted on Instagram the photographs on the left, depicting Usama bin Laden, and the image on the right, which describes martyrdom and is followed by a finger-pointing emoji (this hand sign is commonly used by ISIS supports to symbolize allegiance to ISIS):




## II.    Procedural History

The day after their arrests, on April 1, 2021, the defendants were charged in Complaint 21 Mag. 3574 with attempting (Count One) and conspiring (Count Two) to provide material support and resources to a designated foreign terrorist organization (ISIS), in violation of 18 U.S.C. §§ 2339B and 2. Dkt. 1. On April 28, 2021, a Grand Jury sitting in this District returned Indictment 21 Cr. 277 (PAE), charging the defendants with the same charges as the Complaint. Dkt. 7. Following motion practice pursuant to Rule 12 of the Federal Rules of Criminal Procedure and the Classified Information Procedures Act, trial was scheduled for November 14, 2022.

Prior to trial, on September 9 and September 12, 2022, Bradley and Muthana each pled guilty to Count One of the Indictment, pursuant to their respective plea agreements with the Government. Dkts. 87, 89. Under the terms of each of the defendants' plea agreements, the parties stipulated to an applicable Guidelines sentence of 240 months' imprisonment.

During his allocution at the plea proceeding, Bradley stated the following:

> From in or about May 2020 through March 2021, in the Southern District of New York, I, James Bradley, attempted to provide material support for the Islamic State of Iraq and al-Sham, a designated foreign terrorist organization. I attempted to leave the country to join ISIS. I did this knowingly and intentionally, and I knew it was illegal. I know what I did was wrong. I want to express my full – my regret for my actions and poor decisions. I take full responsibility, and I'm prepared to accept the consequences. I'm not a bad person. Since my incarceration, I've reconnected with my family, and I have been meeting with counselors. With their help, I have been learning, improving and trying to redeem myself. I know the pain I've caused my family. My focus is to make up for what I've done and be a better person for them and for me, and I'm looking forward to a happy and healthy and loving future.

Dkt. 87 at 18. When asked whether Bradley "knew ISIS was either a designated foreign terrorist organization or engaged in terrorist activity at the time he committed the offense," Bradley replied, "Yes." *Id.* at 19.

During Muthana's allocution at the plea proceeding, she stated the following:

> From May 2020 through March 2021, in Manhattan and elsewhere, I attempted to provide services to ISIS which I knew to be a designated foreign terrorist organization. I attempted to provide my personal services to ISIS by attempting to board a boat headed to the Middle East so that I could join ISIS and volunteer my services and fight.

Dkt. 89 at 20. When asked whether "when [she] did these acts, did [she] know that what [she] was doing was wrong" and whether she knew that she was "committing a crime," Muthana replied, "Yes" to both questions. *Id.*

## DISCUSSION

### I.     Applicable Law

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). After that calculation, a sentencing judge must consider the seven factors outlined in 18 U.S.C. § 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant"; the four legitimate purposes of sentencing, as set forth below; "the kinds of sentences available"; the applicable Guidelines range itself; any relevant policy statement by the Sentencing Commission; "the need to avoid unwarranted sentence disparities among defendants"; and "the need to provide restitution to any victims." 18 U.S.C. § 3553 (a)(1)-(7); *see Gall*, 552 U.S. at 50 & n.6

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)    to afford adequate deterrence to criminal conduct;
>
> (C)    to protect the public from further crimes of the defendant; and
>
> (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553 (a)(2).

## II. The Undisputed Guidelines Sentence Is 240 Months' Imprisonment for Bradley and Muthana

It is undisputed that the Guidelines call for a sentence of 240 months' imprisonment for the defendants. As set forth in the defendants' PSRs, and consistent with the terms of the plea agreements, the Guidelines offense level is calculated as follows:

- The Guideline that applies to a violation of 18 U.S.C. § 2339B is U.S.S.G. § 2M5.3, which yields a base offense level for Count One of 26. Bradley and Muthana PSRs ¶ 30.

- Pursuant to U.S.S.G. § 2M5.3 (b)(l)(E), because the offense involved the provision of material support or resources with the intent, knowledge, or reason to believe that they were to be used to commit or assist in the commission of a violent act, two levels are added. *Id.* ¶ 31.

- Pursuant to U.S.S.G. § 3A1.4(a), because the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, 12 levels are added. *Id.* ¶¶ 6(d), 32. The adjusted offense level for Count One therefore is 40. *Id.* ¶ 35.

- Assuming the defendants continue to demonstrate acceptance of responsibility prior to the imposition of sentence, *see* U.S.S.G. § 3E1.1(a), and because they timely notified authorities of their intentions to plead guilty, *see id.* § 3E1.1(b), the offense level is decreased by three levels. *Id.* ¶¶ 37-38.

- Accordingly, the total offense level is 37. *Id.* ¶ 39.

The defendants have no known criminal convictions. *Id.* ¶ 41. However, since the offense involved a federal crime of terrorism, the applicable criminal history category ("CHC") is VI, pursuant to U.S.S.G. § 3A1.4(b). *Id.* ¶ 44. A total offense level of 37 and a CHC of VI result in a Guidelines range of 360 months to life imprisonment. Bradley PSR ¶ 89; Muthana PSR ¶ 64. Because the statutorily authorized maximum sentence for Count One is 240 months' imprisonment, however, the applicable Guidelines range – or, in this case, Guidelines sentence – is 240 months' imprisonment, as stipulated in the plea agreements. Bradley PSR ¶¶ 89, 6(h); Muthana PSR ¶¶ 64, 6(h).

## A. Application of the Terrorism Enhancement Is Appropriate

While the Defendants have stipulated to an applicable Guidelines sentence of 240 months' imprisonment, which includes application of the so-called "terrorism enhancement" under U.S.S.G. § 3A1.4, they now raise several contentions obliquely suggesting that the terrorism enhancement should not be imposed. *See* Bradley Mem. at 16-20; Muthana Mem. at 14-15. Specifically, Bradley asserts that the terrorism enhancement produces unjust results, that putting terrorism defendants in CHC VI contradicts the premise of the Guidelines, and that the enhancement disproportionately impacts defendants who are under 25 years of age. *See* Bradley Mem. at 15-20. Muthana raises similar arguments, and also argues that the enhancement's purported failure to distinguish between defendants whose actions do and do not result in death or injury is inappropriate. *See* Muthana Mem. at 14-15. The defendants' suggestions are without merit. As an initial matter, neither of the defendants claims that the enhancement, by its terms, does not apply in this case, which it plainly does. *See* U.S.S.G. § 3A1.4(a); 18 U.S.C. § 2332b(g)(5). Instead, both Defendants advance arguments amounting to little more than their opinions that the enhancement yields results that are unduly harsh, and is bad policy. But the

Guidelines apply even if defense counsel disagrees with them, and as discussed at greater length below, courts in this Circuit have repeatedly upheld the application of the enhancement in terrorism cases, rejecting precisely these sorts of arguments.

In 1994, Congress mandated that the Sentencing Commission establish a Guidelines enhancement for terrorism offenses to ensure that those convicted of such crimes receive punishment commensurate with the extraordinary nature of their conduct. *See United States v. Stewart*, 590 F.3d 93, 172 (2d Cir. 2009) (Walker, J., concurring in part and dissenting in part) (citing Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, § 120004, 108 Stat. 1796, 2022). The resulting terrorism enhancement at U.S.S.G. § 3A1.4(a) reflects Congress's intent that defendants like Bradley and Muthana who are convicted of terrorism offenses serve sentences that are appropriate in light of the extreme dangerousness of their crimes and the unique risk of recidivism that they present. As Judge Walker explained in his concurrence in *Stewart*:

> The import of this enhancement "could not be clearer": It reflects Congress' and the Commission's policy judgment "that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time."

*Id.* at 172-73 (quoting *United States v. Meskini*, 319 F.3d 88, 91-92 (2d Cir. 2003)); *accord United States v. Ceasar*, 10 F.4th 66, 79 (2d Cir. 2021).

The terrorism enhancement, which clearly applies here, appropriately reflects the seriousness of the conduct in this case. As set forth above, the defendants devoted themselves to a violent terrorist group responsible for the murders of countless American civilians and soldiers, and then tried to join its ranks and advance its cause in the combat arena overseas. Bradley and Muthana sought to travel to Yemen to fight for ISIS; before that, Bradley also made plans to

murder innocent Americans at West Point and at SUNY Albany, and achieve martyrdom here in the United States. And both of the defendants sought to join ISIS with eyes wide open – at the same time that they were doggedly arranging to travel abroad to join ISIS, they were consuming a steady diet of ISIS's twisted videos and its calls to commit violence, and rejoicing when its members heeded those calls. The content of Muthana's phone reveals her deep fixation with the anti-American teachings of al-Awlaki, who promoted terrorist attacks; similarly, Bradley's communications with UC-1 show his embrace of Baghdadi, the former leader of ISIS, as well as of Adnani, the former ISIS spokesperson who called for terrorist attacks in the West, including in the United States. Providing material support and resources – in this case, services and personnel – to a dangerous FTO is a quintessential terrorism offense of the utmost seriousness. Such conduct falls squarely within the class of dangerous activity that Congress has deemed worthy of significant punishment through the application of the terrorism enhancement, and the Guidelines do not overstate the seriousness of the defendants' conduct.

Bradley's argument that the enhancement should be "given little weight" because "[h]is actions were purely to fill a personal need" is a distraction and would, in some sense, be true of all defendants, who are, of course, commonly motivated to commit crimes based in part on their personal circumstances. Bradley Mem. at 17. As described above, whether or not doing so filled some sort of "need," Bradley was fully committed to, and inspired by, ISIS's murderous agenda and application of the terrorism enhancement would be appropriate.

In this regard, Bradley's reference to *United States v. Alhaggagi*, 978 F.3d 693 (9th Cir. 2020), is misplaced. Bradley Mem. at 17. And, in any event, the *Alhaggagi* decision is not controlling in this Circuit and does not support finding the terrorism enhancement inapplicable on the facts of this case, where the defendants intended to commit violent acts for ISIS, specifically,

fighting for ISIS overseas. The court in *Alhaggagi* concluded that the Government had not established that the defendant's non-violent material-support offense was intended to influence government conduct under Section 2332b(g)(5)(A)(1), and explicitly noted that "[i]n cases involving violent acts of terrorism, specific intent is relatively easy to identify, either from the statements or admissions of the defendant or the nature of the offense." *Id.* at 701; *see id.* at 699 (explaining that terrorism enhancement "does not automatically apply to all material support offenses," and "Congress created this distinction in order to punish certain dangerous terrorists more severely than persons who committed non-violent crimes"). Here, Bradley and Muthana's support of ISIS and its cause, their consumption and dissemination of ISIS propaganda, and commitment to fighting with ISIS abroad – and, in the case of Bradley, if he did not travel overseas to attack West Point or ROTC cadets in the United States – was calculated to affect and retaliate against government conduct. Indeed, Bradley ratified this in his submission, explaining that his motivations for the charged conduct included grievances based on U.S. foreign military policy. *See* Bradley Mem, Ex. D at 5, 7, 11 (stating that Bradley had described "grievances toward the Court, United States government, and the United States military," as well as stating that "[Bradley's] grievances against foreign military policy was what angered him and drove his bitterness for America"). The reasoning of *Alhaggagi* is thus entirely consistent with applying the terrorism enhancement here.

Nor is the enhancement's impact on the defendants' CHC inappropriate, as the defense suggests. *See* Bradley Mem. at 18-19; Muthana Mem. at 14-15. Rather, the effect of the terrorism enhancement on the applicable CHC reflects the Sentencing Commission's assessment of the high likelihood of recidivism, and the corresponding need for deterrence, in terrorism cases such as this

one – an assessment the Second Circuit has repeatedly and emphatically endorsed. *See Stewart*, 590 F.3d at 143 (citing *Meskini*, 319 F.3d at 92).

Contrary to Muthana's criticism that the enhancement does not calibrate whether death or injury resulted from a particular terrorist act – and, to be clear, Muthana's characterization of her conduct as merely "attempt[ing] to board a boat from the United States to Yemen" is utterly belied by her own statements to CS-1 and the contents of her phone – the enhancement reflects Congress's deliberate judgment that the enhancement should apply regardless of whether a terrorist act results in death and destruction. *See* Muthana Mem. at 15. As the Second Circuit more recently observed:

> We conclude by underscoring that the Guidelines, while only advisory, appropriately reflect Congress's considered judgment that terrorism is different from other crimes. "[T]errorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal." *Moreover, when it comes to sentencing terrorism, Congress and the United States Sentencing Commission "plainly intended for the punishment of crimes of terrorism to be significantly enhanced without regard to whether, due to events beyond the defendant's control, the defendant's conduct failed to achieve its intended deadly consequences."* Thus, in determining what constitutes a "sufficient" sentence for a terrorist defendant whose conduct did not result in death or physical injury, a sentence at the high end of the applicable range may plainly be reasonable if supported by the balance of § 3553(a) factors.

*United States v. Mumuni Saleh*, 946 F.3d 97, 112-13 (2d Cir. 2019) (emphasis added).

Simply put, application of the terrorism enhancement was plainly correct, and a long line of cases in this District approving of and applying the enhancement firmly reinforces that conclusion. *See United States v. Alimehmeti*, No. 16 Cr. 398 (PAE) (S.D.N.Y.), Dkt. 133 at 16 ("The Second Circuit has, time and again, in its words expressly upheld the lawfulness of the terrorism enhancement. And the Circuit has also specifically found that the Sentencing Commission had a rational basis in fashioning that guideline to increase both a defendant's offense

level and his criminal history category. It has reasoned to the latter that even terrorists with no criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation.") (internal quotations and citations omitted); *see, e.g.*, *id.* at 9 (rejecting challenge to application of terrorism enhancement to material-support offense involving defendant's attempt to facilitate travel of undercover agent to join ISIS, and specifically rejecting argument that Government had failed to show defendant's conduct was directed at impacting government conduct, based on finding that "Alimehmeti was aware of the undercover's purported affiliation with ISIS and that his actions were aiding that cause"); *United States v. Clark*, No. 20 Cr. 76 (NRB) (S.D.N.Y.) (applying terrorism enhancement, and rejecting defense argument that it resulted in overstated offense level and criminal history category, in case involving defendant who supported ISIS through disseminating propaganda online); *United States v. Ullah*, No. 18 Cr. 16 (RJS) (S.D.N.Y.), Dkt. 116 at 10-13 (finding that terrorism enhancement applied, and rejecting defense argument that defendant's conduct was not calculated to affect government conduct, where defendant had attempted to carry out lone-wolf attack in the name of ISIS without having any direct contact with members of ISIS); *United States v. El Bahnasawy*, No. 16 Cr. 376 (RMB) (S.D.N.Y.) (applying terrorism enhancement over defense objection where defendant was convicted of conspiring to carry out terrorist bombing on behalf of ISIS in New York City); *United States v. Rahimi*, No. 16 Cr. 760 (RMB) (S.D.N.Y.) (applying terrorism enhancement where defendant was convicted of carrying out terrorist bombings in Chelsea neighborhood of Manhattan and New Jersey). In sum, the defendants' indirect challenge to the application of the enhancement does not supply a basis for compassionate release, and in any event fails on the merits.

Citing *United States v. Kimbrough*, 552 U.S. 85, 109-10 (2007), Bradley also challenges the process by which the Commission enacted the terrorism enhancement. While the Court has discretion to consider this as a basis for a variance, *Kimbrough* did not suggest that the Commission's "institutional role" and expertise was limited to enacting Guidelines based on empirical data. Rather, the Court noted that the Commission's role also includes the ability to promulgate Guidelines based on "national experience, guided by a professional staff with appropriate expertise." 552 U.S. 85, 109 (2007). Here,

> Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time. Thus, the terrorism guideline legitimately considers a single act of terrorism for both the offense level and the criminal history category.

*Meskini*, 319 F.3d at 92. "Considering the serious dangers posed by all forms of terrorism, the Guidelines are in no way irrational in setting the default for criminal history at a very high level, with downward departures permitted in exceptional cases." *Id.* (citing U.S.S.G. § 4A1.3). Accordingly, the terrorism enhancement is grounded in sound findings by Congress and the Sentencing Commission related to the relatively severe culpability and risks posed by terrorism offenders. By its terms, the enhancement applies in this case and, as discussed in more detail below, the sentencing recommendation resulting from the application of the enhancement sets forth an appropriate range of imprisonment for the Court's consideration.

Finally, citing an expert report from Dr. Adeyinka Akinsulure-Smith regarding the development of the adolescent brain, Bradley asserts that applying the terrorism adjustment is "irrational" for youthful offenders in particular. *See* Bradley Mem. at 20. Bradley also states, without providing a source for his statistics, that whereas, from 2007 to 2017, "18% of all

defendants sentenced in federal court" were under the age of 25, individuals in this age group "made up 28% of all defendants receiving a § 3A1.4 adjustment." *Id.* None of these arguments have any bearing on whether the terrorism enhancement applies. For the reasons set forth above, it plainly does.

In sum, application of the terrorism enhancement is entirely appropriate, and the Guidelines call for a sentence of 240 months' imprisonment, as stipulated in the defendants' plea agreements.

## III.  The Defendants' Relative Culpability

The Government views Bradley and Muthana's culpability as being roughly equivalent to one another, with Bradley being slightly more culpable. As set forth in additional detail above, both Bradley and Muthana attempted to board a cargo ship on March 31, 2021, in order to travel to Yemen to fight for ISIS. Bradley appears to have taken the lead in making these plans. Muthana, however, was a willing participant and fully supportive of this goal. This is evidenced by, for example, the January 1, 2021 chat with CS-1 in which Muthana states that Bradley had asked her "do smth [*i.e.*, something] together," which would involve "no house no kids no etc. just 🍪 " and rejecting the "glitter of this worldly life" (*i.e.*, to fight and die on behalf of ISIS and seek to become a martyr). The absolutely chilling trove of materials on Muthana's cellphone, which include, among other things, a high-production video showing a man in prison garb being burned alive, ISIS propaganda, and materials in support of martyrdom, highlight her commitment to ISIS's cause and her intention when she attempted to board the cargo ship.

Also relevant to their relative culpability is that this was not one-off, aberrant conduct for either defendant. Bradley was on the FBI's radar since at least October 2018 – nearly two-and-a-half years prior to his arrest in the instant case – when he planned to travel with Hossain to Afghanistan to join the Taliban and fight against American soldiers. Despite being interviewed by

FBI agents in July 2019, Bradley was undeterred. In addition, before he ultimately decided to travel abroad in order to fight for ISIS (what Bradley called Plan A), Bradley had made plans to wage jihad in the United States instead (Plan B). Such plans included murdering soldiers at West Point or attacking ROTC cadets where Bradley used to attend college, on behalf of ISIS. Bradley discussed using a truck he bought and seeking to obtain a bomb or ammunition to carry out such an attack.

Muthana had, for at least six months prior to her arrest in this case, while living in Alabama, engaged in extensive in-person and electronic discussions with CS-1 about her support for ISIS, her desire to travel overseas to support ISIS, her admiration for her sister's choice to become an ISIS bride in Syria and for being "ready to die right now"; and her own very serious plans to marry an ISIS fighter. Although the Government is aware of a longer period of time that Bradley supported terrorist groups as compared with Muthana, that is simply based on the nature and time period of the evidence collected in this case – in other words, the Government does not know whether Muthana's support also went back as far as Bradley's.

Finally, the defendants describe certain mitigating circumstances, which, they argue, reduce their culpability. Bradley points to his young age when he committed the offense and describes apparent struggles he had fitting in while growing up. ███████████████████ ███████████████████████████████. In the Government's view, these factors, though very different and difficult to quantify, have roughly equal bearing on the defendants' culpability for their actions.

IV.    **A Sentence of at Least 180 Months' Imprisonment and the Imposition of Lifetime Supervised Release Would Be Appropriate for Both Bradley and Muthana**

The defendants' conduct in this case is nothing less than abhorrent and requires a lengthy term of incarceration. The Government respectfully submits that a below-Guidelines sentence of at least 180 months' imprisonment would be appropriate here, based on certain mitigating circumstances, discussed further below, and in order to avoid unwarranted sentencing disparities with Bradley's associate, Hossain.

A. **The Nature and Seriousness of the Defendants' Conduct and the Need for Just Punishment Warrant a Sentence of at Least 180 Months' Imprisonment**

The extreme seriousness of Bradley's and Muthana's actions, and the need to impose just punishment, warrant a significant sentence of incarceration in this case, which would be satisfied by a sentence of at least 180 months' imprisonment for each of the defendants. *See* 18 U.S.C § 3553(a)(1), (a)(2)(A).

Bradley and Muthana were fully committed to advancing ISIS's mission of violence, death, and destruction. They chose to devote themselves to a brutally violent terrorist group that is dedicated to murdering U.S. citizens and attacking U.S. interests, here and abroad. The defendants attempted to travel overseas to join and fight for ISIS. As a back-up plan, Bradley also prepared to carry out a lone-wolf attack if he were unable to travel overseas to join ISIS, and took concrete steps to do so – considering different targets such as West Point or ROTC cadets at SUNY Albany and the ways in which he might murder them. As Muthana's conversations with CS-1 make clear, Muthana fully expected that she and Bradley would "die together" in service of ISIS. They were willing to give up everything, including their lives, to further ISIS's mission of hate, terror, and violence. Through skillful investigative work, the FBI and NYPD disrupted the defendants, and prevented them from either fighting for ISIS overseas or carrying out an attack here. In short, the

defendants' relentless and multi-faceted mission to serve and support ISIS and terrorism is of the utmost seriousness and warrants a substantial sentence.

Neither Bradley nor Muthana fully grapples with the gravity of the crime that they committed together. While they, on the one hand, purport to fully accept responsibility for their actions, they also, on the other hand, attempt to cast blame elsewhere or minimize the serious nature of their conduct.

In Muthana's submission, she states that she "never had a true desire to harm people" and suggests that her crime consisted of "attempt[ing] to board a boat from the United States to Yemen." Muthana Mem. at 2, 15. Muthana's own statements and conduct flatly contradict this self-serving assertion. Muthana told UC-2 that once she arrived in Yemen, she intended "to fight." Muthana, in chats, celebrated when she learned of a fatal knife attack in France. Muthana told CS-1 that Muthana admired her sister, Hoda, for being willing to die for ISIS. Muthana told CS-1 that Bradley had asked her to "do smth" and "die together." In short, Muthana's own words, taken together with the large collection of materials found on Muthana's cellphone glorifying jihad and martyrdom and reveling in ISIS's bloodshed, show that Muthana intended to kill people and to die a martyr for ISIS had she succeeded in realizing her goal of making it to the Middle East to join ISIS's ranks.

Relatedly, that Muthana did not succeed in boarding the cargo ship and then joining ISIS overseas, should not inure to her benefit – or that of Bradley's – at sentencing. "[W]e are not relegated to wait[ing] until there are victims of terrorist attacks to fully enforce the nation's criminal laws against terrorism." *Stewart*, 590 F.3d at 177 (Walker, J., concurring in part and dissenting in part) (internal quotation marks omitted). "Congress has been unmistakably clear that, as a general matter, the achievement of actual harm may aggravate the seriousness of a terrorism

crime but that the absence of proven harm *does not mitigate such a crime*." *Id.* at 175 (emphasis added). The fact that the defendants did not ultimately injure or kill innocent people is in no sense attributable to the defendants, but to the work of law enforcement who intervened before they could cause any harm. Muthana's failure to fully own up to her conduct in this case is inconsistent with her claim to be "very remorseful about her behavior, her words, and her actions." Muthana Mem. at 22.

Like Muthana, Bradley minimizes his own actions and lays blame elsewhere. Bradley's submission states that he "was an immature teenager, chasing a fantasy," who failed to make plans in support of his terrorist acts, and "never took any actual steps towards violence." Bradley Mem. at 25. Yes, Bradley was eighteen and nineteen years old during the pendency of the charged conduct, but often those who carry out violent attacks for ISIS, or join the group overseas and attack its enemies on the battlefield, are young men just like Bradley. Further, Bradley's conduct was exceedingly serious. Bradley spent months thinking through how best to support ISIS's cause – debating various locations and travel routes to join ISIS abroad, as well as whether to kill Americans domestically, and if so, how to cause maximum impact. When Bradley settled upon joining ISIS in Yemen, he made a plan – he brought Muthana up from Alabama; he bought waterproof clothing and boots for himself and Muthana for the trip; and he arranged travel through UC-2, paying him $2,000. As described by Muthana – whose family is Yemeni – to CS-1, Muthana and Bradley planned to go to a "general area" of Yemen where they could find the "right brothers" (*i.e.*, ISIS), although she stated that she did not wish to discuss it on the chat. Bradley also took other significant, concrete steps in the form of "Plan B," the stateside lone-wolf attack, by scoping out potential targets, and purchasing a truck which he could use for work but also indicated that he could use for killing people. Law enforcement also recovered a machete from his truck after his

arrest. Bradley's efforts to characterize his conduct as mere fantasy are hollow.

Any implication, based on Bradley's reference to "hundreds of conversations with older Muslim men who happened to be confidential informants or undercovers," that Bradley was somehow manipulated or victimized by the undercover agents who engaged with him, is wholly false. *Id.* at 24. Hossain introduced Bradley to CS-2 and CS-3 in 2018. By that point, Bradley was already fully radicalized; he was prepared to travel abroad with Hossain to join the Taliban, but ultimately did not because, at least in part, he felt that Hossain's plan was not in keeping with Bradley's even stricter version of Islam. After interviewing Bradley when Hossain was arrested, the FBI continued to monitor him. In no sense were the undercover agents responsible for Bradley's continued radicalization or shift toward ISIS. It was Bradley who posted extremist content and communicated with other ISIS supporters online; Bradley who suggested targets for a lone-wolf attack in the United States; Bradley who suggested traveling to Yemen by cargo ship to fight for ISIS; and Bradley who sought out and married, in Muthana, a like-minded supporter of ISIS. Law enforcement ultimately chose to disrupt Bradley's activities because he posed a grave threat to public safety and national security. Had law enforcement not intervened, one of two things would probably have happened. Bradley would have succeeded in Plan A: his goal of traveling overseas to join and fight for ISIS, and taking up arms against American soldiers on the battlefield. Or, if he continued to be thwarted in his efforts to travel overseas to join ISIS, he was well on his way to carrying out Plan B: a lone-wolf attack, in accordance with ISIS's directives to its followers. Thus, the law enforcement operation, and the ultimate arrest of Bradley, likely saved lives, including Bradley's.

The defendants' efforts to minimize their conduct ignore their value to ISIS's mission of global terror, and fail to fully reckon with their responsibility and roles in the crime.

42

### B. A Sentence of at Least 180 Months' Imprisonment Is Necessary to Protect the Public from Further Terrorism Crimes Committed by the Defendants

The need to protect the public from further crimes of the defendants, *see* 18 U.S.C. § 3553(a)(2)(C), is a paramount consideration here, and strongly supports the imposition of a sentence of at least 180 months' incarceration.

Terrorism is a crime with high recidivism rates, and the rehabilitation of terrorism defendants like Bradley and Muthana is notoriously difficult. *See Meskini*, 319 F.3d at 91-92 (noting the link between "the difficulty of deterring and rehabilitating" terrorism defendants and the conclusion that "terrorists and their supporters should be incapacitated for a longer period of time"). Bradley and Muthana's absolute commitment to ISIS and the radical Islamic terrorist ideology that it espouses and their aspiration to commit the ultimate sacrifice, to travel abroad to martyr themselves for ISIS and its cause, all support a single conclusion: the defendants committed a heinous crime and should serve a lengthy term of incarceration. Whatever the merits of the intervention programs described by defense counsel as an alternative to incarceration in this case, the defendants' history, conduct, and abiding commitment to terrorism all suggest that incapacitation for a significant period of time remains the proper course here.

### C. Bradley's Personal Circumstances Do Not Support a Sentence of Less Than 180 Months

A substantial sentence of at least 180 months' imprisonment would be appropriate due to certain of the mitigating factors raised by the defense, including Bradley's youth and purported progress toward rehabilitation, considered in combination with the need to avoid sentencing disparities, as described in Section E below.

The Court should reject Bradley's argument that he poses little risk to the community. In the psychological evaluation report prepared for the defense by Dr. Akinsulure-Smith, which he

submits to support this assertion, there is no indication that, beyond discussing his use of electronic devices to watch radical content, Bradley provided any account of his actual crime to the expert. Bradley Mem., Ex. C at 2. Nor does it appear that Dr. Akinsulure-Smith was provided with any of the discovery in this case, including the copious chats and recordings in which Bradley describes his plans for attacking Americans here and abroad. ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████. *Id.* at 3. Without having the information at her disposal to fully understand the risk of violence Bradley already posed to his community prior his arrest in this case, Dr. Akinsulure-Smith's conclusion that Bradley is "of low risk of future violence" requires a healthy dose of skepticism. *Id.* at 2.

However admirable, and important, the work of the organization, the Court should also approach with skepticism the Parents for Peace report's conclusion that Bradley "[f]or all intents and purposes, . . . has been deradicalized. He no longer holds extreme Islamic beliefs, and we do not believe he poses a danger to society." Bradley Mem., Ex. D at 2. First, the Parents for Peace report asserts that Bradley has been "deradicalized," which it defines as a "shift away from supporting violence as a means for achieving political or ideological goals." *Id.* at 3. The report does not say that Bradley has fully completed the process of "disengagement," but rather states that he is "on the trajectory to full disengagement" and that "his full engagement and behavior change would naturally be a bit more difficult to evaluate." *Id.* at 3, 12. The Parents for Peace report defines "disengagement" as, in part, "a change in role or function that is usually associated with a reduction of violent participation." *Id.* at 3. In other words, the Parents for Peace report takes the position that Bradley's mindset has changed, but that the counselors cannot evaluate

whether his behavior has actually changed. Accordingly, the group's assessment that Bradley no longer poses a danger to society is wanting. ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████. This is patently false. In numerous chats and messages, Bradley reaffirms time and again that his desire to fight for ISIS is what drove him to travel abroad. Bradley allocuted to this very conduct when he stated, "I attempted to leave the country to join ISIS." Dkt. 87 at 18. And Muthana, in chats with CS-1, corroborated that Bradley had told her of his desire to fight, and die, in Yemen – Muthana texted CS-1 on January 1, 2021 that Bradley wanted "no house no kids no etc. just 👊" because he was rejecting the "glitter of this worldly life." Even so, the defense report concludes that Bradley does not pose "a threat to society or his community." Bradley Mem., Ex. D at 12. Third, and relatedly, as with Dr. Akinsulure-Smith's analysis, there is no indication that the Parents for Peace counselors were provided with evidentiary materials from the case in order to be in a better position to evaluate whether he was lying or minimizing his conduct.

Bradley also argues that his age is a mitigating circumstance. To be clear, Bradley's age is squarely in line with the ages of other young, male ISIS followers who have joined the group and attacked and killed in its name. Bradley chose to radicalize and devote himself to ISIS, and he was prepared to leave his home in the United States, join ISIS on the battlefield, and kill to further its cause. His devotion to ISIS was not a flight of youthful fancy. Bradley began radicalizing at least

as early as 2018. He was not deterred by the FBI interview that came soon after Hossain's arrest;

he turned his attention to ISIS, and to preparing for a potential lone-wolf attack while still working

towards his goal of joining ISIS overseas. Defense counsel's arguments regarding the defendant's

reported difficulties growing up also are unpersuasive. The Defendant has benefitted from a host

of advantages, including financial stability and a remarkably supportive and loving family. Many

people do not have these advantages, and they do not turn to crime, let alone to terrorism.

In sum, the Government does not dispute that defense counsel has identified certain

arguably mitigating factors at sentencing, which, in combination, and together with the need to

avoid unwarranted sentencing disparities with Bradley's associate, Hossain, justify a sentence of

at least 180 months' imprisonment.

### D. Muthana's Personal Circumstances Do Not Support a Sentence of Less Than 180 Months

A substantial sentence of at least 180 months' imprisonment would be appropriate in light

of certain of the mitigating factors raised by Muthana, ████████████████████████████

████████████████████████████ considered in combination with the need to avoid

unwarranted sentencing disparities, as described in Section E below.

The Court should reject Muthana's claim that she "was not actually radicalized but was in

fact a traumatized and confused young woman." Muthana Mem. at 16. The Government is

cognizant of Muthana's and her experts' descriptions of ████████████████████████████

████████████████████████████████. Exs. A (Muthana's letter

to the Court), E (Report of Ms. Jenny G. Crawford, LMSW), F (Report of Dr. Catherine M.

Barber). However, the fact remains: Muthana was 28 and 29 years old during the offense conduct.

████████████████████████, she was, ultimately, an adult who made her own

46

decisions. Those decisions included seeking out and marrying a fellow ISIS supporter; attempting to travel to and fight for ISIS, despite the years of heartbreak caused by her sister's decision to do the same, years earlier; seeking out, downloading, consuming, and celebrating pro-ISIS propaganda and other extremist materials, which included terrorist attack training manuals and a barbaric video of a person getting burned to death; participating in chatrooms with fellow ISIS supporters; and even encouraging CS-1 to join in her and Bradley's mission to travel to Yemen to fight with ISIS, stating that Bradley had said he wished to have several wives and "perhaps some slaves too." Muthana knew right from wrong and had full agency in seeking to support ISIS. In arguing that Muthana's actions were merely ███████████████████████████ Muthana ignores the damning evidence against her in chat after chat, in recording after recording, and in the hundreds of pieces of repugnant, radical content on her cellphone. Muthana Mem. at 3. And she ignores that on March 31, 2021, Muthana was fully prepared to board a cargo ship bound for Yemen in order to fight for ISIS. While the Government disagrees with Muthana's minimization of her conduct and failure to address squarely the nature of her support for ISIS, it is also the case that these aspects of Muthana's personal history and characteristics merit some consideration by the Court.

In light of the arguably mitigating circumstances raised by defense counsel, in combination, and together with the need to avoid unwarranted sentencing disparities with Bradley's associate, Hossain, a sentence of at least 180 months' imprisonment would be appropriate here.

### E. A Sentence of at Least 180 Months' Imprisonment Will Avoid Creating Unwarranted Sentence Disparities

A sentence of at least 180 months is reasonable and warranted for Bradley and for Muthana in order to avoid creating sentencing disparities across comparable terrorism cases.

Throughout the United States, terrorism defendants who have attempted to travel, successfully traveled, or assisted other individuals in traveling to join foreign terrorist groups have frequently received substantial sentences, often the maximum term allowed by statute. *See Stewart*, 590 F.3d at 166 n.4 (Walker, J., concurring in part and dissenting in part) ("Most of these courts chose the maximum material support sentence available to them under federal law . . .").

For example, in *United States v. Raishani*, No. 17 Cr. 421 (RA) (S.D.N.Y.), defendant Adam Raishani – who had voiced support for ISIS for approximately two years – pleaded guilty to one count of attempting and one count of conspiring to provide material support to ISIS, in violation of 18 U.S.C. §§ 2339B and 371. Raishani had attempted to leave the United States to join ISIS but had been stopped by law enforcement before he was able to do so. Raishani's Guidelines range was 300 months' imprisonment, the statutory maximum. Judge Abrams sentenced him to concurrent sentences of 240 and 60 months' imprisonment, the statutory maximum penalty on each count.

Similarly, in *United States v. Alimehmeti*, No. 16 Cr. 398 (PAE) (S.D.N.Y.), defendant Sajmir Alimehmeti pleaded guilty to one count of providing and attempting to provide material support to ISIS, in violation of 18 U.S.C. §§ 2339B and 2, and one count of making a false statement in a passport application to facilitate an act of international terrorism, in violation of 18 U.S.C. § 1542. Alimehmeti had radicalized, supported ISIS, and attempted to facilitate the travel of an undercover agent to join ISIS overseas. Alimehmeti's Guidelines range was 360 to 540

months' imprisonment, the statutory maximum. This Court sentenced him to concurrent sentences of 240 and 264 months' imprisonment.

In *United States v. Farhane, et al.*, No. 05 Cr. 673 (LAP) (S.D.N.Y.), defendant Rafiq Sabir was convicted, following a jury trial, of one count of attempting and one count of conspiring to provide material support to al Qaeda, by providing medical services to al Qaeda personnel. Sabir's Guidelines range was 360 months' imprisonment, the statutory maximum. At sentencing, Sabir requested a sentence of only 60 months' imprisonment, claiming that he had been ensnared by a government sting operation. Judge Loretta A. Preska sentenced Sabir to 300 months' imprisonment.

*Raishani*, *Alimehmeti*, and *Farhane* are but several examples. Courts have routinely imposed sentences at or near the statutory maximum in numerous other cases involving defendants convicted of providing or attempting to provide material support to FTOs, by either attempting to travel or facilitating the travel of others to join the FTO. *See, e.g. United States v. Clark*, No. 20 Cr. 76 (NRB) (S.D.N.Y.) (defendant sentenced to statutory maximum of 20 years' imprisonment for disseminating large quantities of pro-ISIS propaganda and terrorist-attack training manuals in online chatrooms, participating and administering chatrooms, and exhorting other participants in chatrooms to commit lone-wolf attacks in United States); *United States v. Badawi, et. al*, No. 15 Cr. 60 (C.D. Cal.) (two defendants each sentenced to statutory maximum of 15 years' imprisonment for conspiring to provide material support to ISIS, where one defendant was arrested at airport attempting to travel overseas to join ISIS and the other defendant had supported and assisted his travel); *United States v. Pugh*, No. 15 Cr. 116 (NGG) (E.D.N.Y.) (defendant sentenced to statutory maximum of 15 years' imprisonment for attempting to travel to Syria to join ISIS); *United States v. Alaa Sadeh*, No. 15 Cr. 558 (SDW) (D.N.J.) (defendant sentenced to statutory

maximum of 15 years' imprisonment for assisting another individual to travel to join ISIS overseas); *United States v. Zea*, No. 13 Cr. 72 (SJF) (E.D.N.Y.) (defendant sentenced to statutory maximum of 15 years' imprisonment for attempting to travel to Yemen to join AQAP); *see also United States v. Kourani*, 6 F. 4th 345, 357–59 (2d Cir. 2021) (affirming district court's sentence of 40 years' imprisonment for defendant's conviction of various offenses, including providing and conspiring to provide material support to Hizballah, in part because sentence "simply reflects Congress' judgment as to the appropriate national policy for such crimes" (alterations and internal quotation marks omitted)).

The 96-month sentence imposed by Judge Stein on Bradley's associate, Hossain, in *United States v. Hossain*, No. 19 Cr. 606 (SHS), was an outlier, and, the Government respectfully submits, far too low. Hossain was convicted, following a jury trial, of one count of attempting to provide material support to the Taliban and one count of attempting to contribute funds, goods, or services to the Taliban. Hossain's Guidelines sentence was 420 months' imprisonment, the statutory maximum, and Probation recommended 300 months' imprisonment. Judge Stein imposed a sentence of 96 months based on what Judge Stein characterized as Hossain's "unlikely and muddled and unrealistic" plan as well as various mitigating factors, and also noted "there was no victims or tangible injuries." The Government strongly disagrees with this assessment and with the sentence imposed in Hossain's case, which should be heavily discounted and not serve as a guidepost in any way for the sentencing calculus of this Court for the defendants.

Without accepting this characterization of Hossain's conduct, the Government respectfully submits that, in Bradley's case, Bradley's plan to travel to Yemen to join ISIS was realistic. As described above, this plan included bringing Muthana to New York; buying waterproof clothes and boots for the trip; arranging and paying for travel; and planning to travel to Yemen where,

according to Muthana, they could locate ISIS members. Moreover, as overseas recruitment of potential ISIS members, like Bradley, is a significant part of ISIS's model, it is reasonable to think that ISIS would have systems in place to absorb such recruits. For his "Plan B," Bradley also considered potential targets to kill stateside, and purchased a truck which he indicated that he could use for killing people.

Moreover, certain aspects of Bradley's conduct and characteristics are more troubling than Hossain's. Bradley withdrew from the conspiracy with Hossain in 2019 because, at least in part, his version of Islam was even more extreme than Hossain's. Bradley also continued supporting terrorism even after the FBI first intervened following Hossain's arrest. And Bradley shifted his allegiance to ISIS, which is known as being particularly devoted to killing Americans and destroying American interests in its mission to form a global caliphate. In light of these factors and that, in the Government's view, Hossain's sentence was inappropriately low, a sentence of at least 180 months would be justified and proportionate here.

The defendants' request for time-served sentences is completely out of line with the cases cited above and utterly fails to account for the gravity of the defendants' crime. In this regard, a recent decision from the Second Circuit is instructive. In *United States v. Ceasar*, 10 F.4th 66 (2d Cir. 2021), the defendant "expressed her support for ISIS, encouraged others to join ISIS abroad, and helped individuals in the United States contact ISIS members overseas," who "then facilitated U.S.-based ISIS supporters' travel to ISIS-controlled territory." *Id.* at 68. The defendant "herself intended to travel to ISIS territory by way of Sweden, where she planned to marry another ISIS supporter." *Id.* However, the defendant was stopped by law enforcement at JFK Airport before she could achieve her goal. *See id.* The defendant ultimately pleaded guilty to one count of conspiring to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B,

and one count of obstruction of justice, in violation of 18 U.S.C. § 1512(c)(1). *See id.* at 68-69. The defendant's Guidelines range was 360 to 600 months' imprisonment. *See id.* at 69. The court imposed a sentence of just 48 months' imprisonment, approximately 13% of the bottom of the Guidelines range. *See id.*

On appeal by the Government, the Second Circuit vacated the sentence and remanded for resentencing. *See id.* at 70. The court's decision was based on several grounds, one of which was that, "in comparison with sentences for similar terrorism crimes, [the defendant's] sentence of 48 months' imprisonment was shockingly low and unsupportable as a matter of law." *See id.* In reaching that determination, the Second Circuit analogized to two other cases in which it had vacated a sentence and remanded for resentencing based on substantive unreasonableness: *United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009), in which the defendant had a Guidelines range of 360 months' imprisonment, but was sentenced to only 28 months' imprisonment; and *United States v. Mumuni Saleh*, 946 F.3d 97 (2d Cir. 2019), in which the defendant had a Guidelines range of 85 years' imprisonment, but was sentenced to only 17 years' imprisonment. *See Ceasar*, 10 F.4th at 80-82.

Additionally, the court surveyed "the sentences imposed in a handful of recent material support cases," which "illustrate[d] the unwarranted disparity reflected by the 48-month sentence imposed" by the district court. *See Ceasar*, 10 F.4th at 84. Specifically, the court cited *United States v. Naji*, No. 16 Cr. 653 (FB) (E.D.N.Y.), in which the defendant pleaded guilty to one count of attempting to provide material support to ISIS, in violation of 18 U.S.C. § 2339B, based on his posting of violent, pro-ISIS content on social media and his travel to Yemen to join ISIS, and was sentenced to the statutory maximum of 240 months' imprisonment. *See Ceasar*, 10 F.4th at 84-85. The court also cited *United States v. Saidakhmetov*, No. 15 Cr. 95, 2018 WL 461516 (WFK)

(E.D.N.Y. 2018), in which the defendants each pleaded guilty to one count of conspiring to provide material support to ISIS, in violation of 18 U.S.C. § 2339B, after one defendant was arrested at JFK Airport while attempting to travel to ISIS-controlled territory through Turkey, and the other defendant was arrested at his apartment shortly before embarking on similar travel. *See Ceasar*, 10 F.4th at 85. The defendants were each sentenced to the statutory maximum of 180 months' imprisonment. These are yet two more cases that, along with the reasoning in *Ceasar*, support the imposition of a sentence of at least 180 months in this terrorism case.

### F.  A Sentence of at Least 180 Months' Imprisonment is Necessary to Afford Adequate Deterrence and to Promote Respect for the Law

A Guidelines sentence is also necessary in order to adequately deter criminal conduct – in this case, terrorism aimed at harming Americans and American interests – and to promote the law prohibiting such destructive conduct. *See* 18 U.S.C. § 3553(a)(2)(A)-(B).

With respect to Bradley, it is clear that his prior contact with the criminal justice system did not deter him from supporting terrorists. Despite intervention by law enforcement in 2019 after Bradley nearly traveled abroad, with Hossain, in order to support the Taliban, Bradley proceeded, less than two years later, to nearly travel abroad in support of a different extremist group. But this time, Bradley's conduct was even more frightening. Not only did Bradley actually show up at the agreed-upon date and time, unlike in 2019, but this time he was intending to travel abroad to support ISIS, a designated FTO. Based on this history, there is every reason to believe that a significant term of incarceration of at least 15 years is necessary to adequately achieve specific deterrence.

Specific deterrence is also an important consideration with respect to Muthana. It is clear that Muthana was, for at least many months, absolutely determined, to marry an ISIS fighter and

to travel abroad in order to fight with ISIS. Also clear is the depths of her support for ISIS and its terrorist agenda. It is imperative that the Court incapacitate this defendant and also send the message that attempting to support ISIS will result in a lengthy prison sentence.

The defendants' sustained allegiance to ISIS, their willingness to take up arms against their country and kill their fellow citizens, and their aspirations to commit the ultimate sacrifice, to martyr themselves in service to ISIS, all support the conclusion that they are both deeply radicalized individuals, and that specific deterrence and incapacitation are crucial.

General deterrence is exceedingly important in this case as well. "General deterrence is essential here so that the severe consequences of choosing terrorism are apparent to all who might consider it." *United States v. Babafemi*, No. 13 Cr. 109, 2021 WL 1210313, at *6 (E.D.N.Y. Mar. 31, 2021). As Judge Walker has observed, "[i]n no area can the need for adequate deterrence be greater than in terrorism cases, with their potential for devastating loss of innocent life." *Stewart*, 590 F.3d at 181 (Walker, J., concurring in part). In imposing a sentence of 240 months' imprisonment on a terrorism defendant in *United States v. Clark*, Judge Buchwald explained: "[O]f enormous importance here is that the sentence of [the defendant], even if it were not necessary to deter him, would be justifiable for the reasons of general deterrence. *The message must be loud and clear. Provide or attempt to provide material support and resources to a foreign terrorist organization and you will spend a very long time in jail*." No. 20 Cr. 76 (NRB), Dkt. 31, Tr. 30-31 (emphasis added).

Terrorist organizations' ability to thrive depends in significant part on their ability to attract, indoctrinate, and enlist new followers, like Bradley and Muthana, who are committed to advancing and serving the group's agenda or dying in the attempt. Deterring such conduct is particularly important in today's environment, when many individuals in the West, including in

54

the United States, have become radicalized by jihadist propaganda and have either traveled or tried to travel to the Middle East to join such groups. It is vital for our country's national security that other young people who reside in the United States, when exposed to hateful extremist teaching, be deterred from choosing to follow a path similar to these Defendants and engaging in potentially devastating conduct in support of such groups. It is important for those who are considering joining a terrorist organization to know that the consequences for such conduct are exceedingly serious. And it is important for the public to know that those who seek to join and support terrorist organizations will face serious punishment preventing them from causing harm to society. A sentence of at least 180 months' imprisonment would be appropriate to serve the pressing need for general deterrence of such terrorism offenses.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the Court should sentence Bradley and Muthana to at least 180 months' imprisonment and a lifetime term of supervision – the sentence called for by the Guidelines and recommended by the Probation Office – as such a sentence is sufficient but not greater than necessary to comply with the purposes of sentencing pursuant to 18 U.S.C. § 3553(a).

Dated:  New York, New York
        January 26, 2023

                                        Respectfully submitted,

                                        DAMIAN WILLIAMS
                                        United States Attorney for the
                                        Southern District of New York

                            By:     __/s/_____
                                        Kaylan E. Lasky / Jason A. Richman
                                        Assistant United States Attorneys
                                        212-637-2315 / -2589